[L. A. No. 28843. In Bank. May 4, 1967.]

THE PEOPLE, Plaintiff and Appellant, v. UNITED NATIONAL LIFE INSURANCE COMPANY, Defendant and Respondent.

[L. A. No. 28844. In Bank. May 4, 1967.]

THE PEOPLE, Plaintiff and Appellant, v. PIONEER LIFE INSURANCE COMPANY, Defendant and Respondent.

[L. A. No. 28845. In Bank. May 4, 1967.]

THE PEOPLE, Plaintiff and Appellant, v. NATIONAL LIBERTY LIFE INSURANCE COMPANY, Defendant and Respondent.

(Consolidated Cases.)

Thomas C. Lynch, Attorney General, and H. Warren Siegel, Deputy Attorney General, for Plaintiff and Appellant.

O'Melveny & Myers, Warren M. Christopher, William W. Vaughn, Girard E. Boudreau, Jr., Beardsley, Hufstedler & Kemble, Seth M. Hufstedler and John Sobieski for Defendants and Respondents.

Davis, Polk, Wardwell, Sunderland & Kiendl, Richard E. Nolan, Charles S. Hoppin and J. Anthony Kline as Amici Curiae on behalf of Defendants and Respondents.

SULLIVAN, J.— We hold in these consolidated cases that California can constitutionally regulate insurance transactions of foreign insurance companies which, although they have no agents in this state, solicit and negotiate such transactions with California residents exclusively by mail from offices outside this state. Additionally we conclude that foreign insurers engaging in such activities are subject to the provisions of section 700 of the Insurance Code[1] and, as a

---

[1]Hereafter, unless otherwise indicated, all section references are to the Insurance Code.

condition precedent to engaging therein, must procure from the Insurance Commissioner of this state (commissioner) a certificate of authority in accordance with that section. As we explain, *infra,* we find that such regulation comports with applicable criteria of federal due process and is free of conflict with any federal law or regulation. We also point out that the conclusions which we reach do not affect the validity or enforceability of pertinent insurance policies heretofore contracted by defendants. We therefore reverse the judgments.

The facts are not in dispute. Defendants United National Life Insurance Company (United), Pioneer Life Insurance Company (Pioneer) and National Liberty Life Insurance Company (National) were organized under the laws of other states[2] and have offices only in the respective states of their incorporation. Each defendant is licensed by its home state to carry on the particular class of insurance business in which it is engaged. Generally speaking all three companies solicit insurance business exclusively by mail.

In the Pioneer and National cases the defendants solicit residents of California by mailing to the latter individually from their home offices (see fn. 2, *ante*) application forms and other material. These documents explain the particular policy being offered, set forth the premiums, emphasize the low cost of the coverage, and urge the California addressee to complete and return the application form, together with payment of the first premium, to the company at its home office. The policy is thereafter issued at the home office and mailed to the applicant. Payments of subsequent premiums are received from the California policyholder by mail.

In the case of United there is a difference in the method of operation. As part of its solicitation by mail, United issues a pre-indorsed policy and sends it to California residents who are parents of recently inducted members of the armed services, together with an ''ownership application'' and other material explaining the policy. The recipient is urged to complete and return the application, together with payment of the designated first premium. Unlike the policies of Pioneer and National which, as we have said, are issued by the company at its home office only after it has received the completed application and first premium, United's policy is effective immediately upon deposit by the policyholder of the com-

[2]United was incorporated in Arizona; Pioneer in Illinois; and National in Pennsylvania.

pleted application and required premium in the United States mail in California.

None of the three companies has offices or agents in California; has any other representative within this state; or has at any time applied to the commissioner for, or received from him, a certificate of authority as provided in section 700.[3]

These actions were brought by the commissioner in the name of the People pursuant to section 12928.6[4] to enjoin defendant companies "from engaging directly or indirectly, by mail or otherwise" in the insurance business in California or "from transacting insurance in California as defined in section 35" unless and until a certificate of authority is obtained in compliance with section 700. In their respective answers, defendants in the main admitted their methods of solicitation by mail as alleged by the commissioner in his complaints and as described above, but denied that they had violated or would in the future violate any of the provisions of the California Insurance Code. The answers also set forth a number of affirmative defenses, which, it is sufficient to say at this point, asserted the lack of power or jurisdiction of the court to grant the relief prayed for by the commissioner and additionally the inapplicability of sections 35 and 700 to the particular insurance business being conducted by them. In each of the actions motions for summary judgment were filed by the plaintiff and by the respective defendant company. In each the court granted the defendant's motion and denied plaintiff's motion upon the ground that California could not constitutionally regulate the type of insurance business being conducted.[5] Judgments were entered accordingly. These appeals by the People followed.

---

[3] See fn. 11, *infra*.

[4] Section 12928.6 provides: "Whenever the commissioner believes, from evidence satisfactory to him, that any person is violating or about to violate any provisions of this code or any order or requirement of the commissioner issued or promulgated pursuant to authority expressly granted the commissioner by any provision of this code or by law, the commissioner may bring an action in the name of the people of the State of California in the superior court of the State of California against such person to enjoin such person from continuing such violation or engaging therein or doing any act in furtherance thereof. In such action an order or judgment may be entered awarding such preliminary or final injunction as is proper."

[5] The memorandum of decision states in pertinent part: "Constitutionally, the State of California is without power to regulate this type of mail-order insurance business, where defendant has no offices, employees, or agents in California, and deals with California residents only through the mail from its offices" in another state.

Simply stated the issues before us are these: (1) Whether California can constitutionally regulate the transaction of the mail order insurance business; and (2) whether section 700 is applicable to such business.

We consider the first issue in an historical setting. In 1869 the United States Supreme Court held that policies of insurance "are not articles of commerce in any proper meaning of the word . . . [and] are not inter-state transactions, though the parties may be domiciled in different States." (*Paul* v. *Virginia* (1869) 75 U.S. (8 Wall.) 168, 183 [19 L.Ed. 357, 361].) *Paul* and many cases following it upheld state regulation of the insurance business on the premise that it was not interstate commerce and therefore not subject to federal regulation under the commerce clause. In 1944 in *United States* v. *South-Eastern Underwriters Assn.*, 322 U.S. 533 [88 L.Ed. 1440, 64 S.Ct. 1162], in what it later described as "a reorientation of attitudes toward federal power in its relation to the business of insurance conducted across state lines" (*Prudential Ins. Co.* v. *Benjamin* (1946) 328 U.S. 408, 414 [90 L.Ed. 1342, 66 S.Ct. 1142, 164 A.L.R. 476]), the Supreme Court held that such business *was* interstate commerce and consequently subject to federal regulation. As the parties herein point out to us, in the interval between *Paul* and *South-Eastern Underwriters* state regulation of the insurance business proliferated without restrictions other than those predicated upon the due process clause of the federal Constitution. Comprehensive state systems of regulation and taxation were predicated "on the rationalization that insurance was not commerce, yet was business affected with a vast public interest . . . [and] the negative implications of the commerce clause became irrelevant, . . ." (*Prudential Ins. Co.* v. *Benjamin, supra,* 328 U.S. 408, 415-416.)

To meet the threat to state regulation presented by the holding in *South-Eastern Underwriters* and to preserve state regulation from attacks based on the commerce clause, Congress in 1945 promptly passed the McCarran Act (15 U.S.C.A. §§ 1011-1015). This act expressly provided that the regulation and taxation of the business of insurance should be subject to the laws of the several states.[6] The Supreme Court in *Pruden-*

---

[6] 15 U.S.C.A., § 1012, so far as is here pertinent provides: "(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

"(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating

*tial Ins. Co.* v. *Benjamin, supra,* 328 U.S. 408, rejected a broad and vigorous attack on the act and dispelled any doubt as to the efficacy of the McCarran Act to free state regulation from possible commerce clause restraint. As the court there said: ''Obviously Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance. This was done in two ways. One was by removing obstructions which might be thought to flow from its own power, whether dormant or exercised, except as otherwise expressly provided in the Act itself or in future legislation. [Fn. omitted.] The other was by declaring expressly and affirmatively that continued state regulation and taxation of this business is in the public interest and that the business and all who engage in it 'shall be subject to' the laws of the several states in these respects.'' (Pp. 429-430.)

As the parties before us recognize, the McCarran Act, while validating state power to regulate and tax in respect to the commerce clause, did not purport to circumscribe such power in the light of the due process clause. It remained for the court's decision in *State Board of Insurance* v. *Todd Shipyards Corp.* (1962) 370 U.S. 451 [8 L.Ed.2d 620, 82 S.Ct. 1380], to construe and assess the act as against due process requirements. *Todd* which we discuss in more detail *infra,* affirmed a Texas decision declaring unconstitutional a statute imposing a tax on premiums paid to an insurer not licensed to do business in that state. The court in *Todd* held that state regulation should be examined in the light of due process criteria existing prior to the enactment of the McCarran Act and ''should be kept within the limits set by'' *Allgeyer* v. *Louisiana* (1897) 165 U.S. 578 [41 L.Ed. 832, 17 S.Ct. 427], *St. Louis Cotton Compress Co.* v. *Arkansas* (1922) 260 U.S. 346 [67 L.Ed. 297, 43 S.Ct. 125] , and *Connecticut General Life Ins. Co.* v. *Johnson* (1938) 303 U.S. 77 [82 L.Ed. 673, 58 S.Ct. 436]. (*State Board of Insurance* v. *Todd Shipyards Corp., supra,* 370 U.S. at p. 456.)

Quoting from the House report and the Senate debate on the act,[7] the court said: ''We need not decide *de novo* wheth-

the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: . . .''

[7]The court quoted from the House report as follows: '' 'It is not the intention of Congress in the enactment of this legislation to clothe the States with any power to regulate or tax the business of insurance beyond that which they had been held to possess prior to the decision of the United States Supreme Court in the *Southeastern Underwriters Associa-*

er the results (and the reasons given) in the *Allgeyer, St. Louis Cotton Compress,* and *Connecticut General Life Insurance* decisions are sound and acceptable. For we have in the history of the McCarran-Ferguson Act an explicit, unequivocal statement that the Act was so designed as not to displace those three decisions.'' (370 U.S. at p. 455.)

''The power of Congress to grant protection to interstate commerce against state regulation or taxation [citations] or to withhold it [citations] is so complete [fn. omitted] that its ideas of policy should prevail.

''Congress, of course, does not have the final say as to what constitutes due process under the Fourteenth Amendment. . . . But the policy announced by Congress in the McCarran-Ferguson Act was one on which the industry had reason to rely since 1897, when the *Allgeyer* decision was announced; . . . When, therefore, Congress has posited a regime of state regulation on the continuing validity of specific prior decisions [citation], we should be loath to change them.'' (Pp. 456-457.)

''Here Congress tailored the new regulations for the insurance business with specific reference to our prior decisions. Since these earlier decisions are part of the arch on which the new structure rests, we refrain from disturbing them lest we change the design that Congress fashioned.'' (P. 458.)

The several parties to the present controversy appear to agree that the first issue before us must be determined according to principles of due process found in the pre-McCarran Act decisions. They are in dispute, however, as to the precise meaning and extent of these principles. We face the usual alignment and distinguishing of precedents on all sides. It is

*tion case.* Briefly, your committee is of the opinion that we should provide for the continued regulation and taxation of insurance by the States, subject always, however, to the limitations set out in the controlling decisions of the United States Supreme Court, as, for instance, in *Allgeyer* v. *Louisiana* (165 U.S. 578 [41 L.Ed. 832, 17 S.Ct. 427]), *St. Louis Cotton Compress Co.* v. *Arkansas* (260 U.S. 346 [67 L.Ed. 297, 43 S.Ct. 125]), and *Connecticut General Ins. Co.* v. *Johnson* (303 U.S. 77 [82 L.Ed. 763, 58 S.Ct. 436]), which hold, inter alia, that a State does not have power to tax contracts of insurance or reinsurance entered into outside its jurisdiction by individuals or corporations resident or domiciled therein covering risks within the State or to regulate such transactions in any way.' H. R. Rep. No. 143, 79th Cong., 1st Sess., p. 3.'' (370 U.S. 455-456.)

The court also quoted the following statement made by Senator McCarran during the Senate debate after reading the above excerpt from the House report: '' '. . . we give to the States no more powers than those they previously had, and we take none from them.' '' (P. 456.)

necessary that we first briefly examine the trilogy of Supreme Court decisions cited above.

In *Allgeyer,* the court struck down as violative of the due process clause a Louisiana statute imposing a fine on any person insuring, or doing any act to effect insurance on, property in the state with an insurance company that had not complied with Louisiana law. Defendants, exporters and residents of Louisiana, entered into an open contract of marine insurance in New York with an insurer that was organized in and doing business in the State of New York. The insurance covered bales of cotton shipped from New Orleans to foreign ports. The insurer had no agents in Louisiana and engaged in no activities of any kind within that state. The only act done in Louisiana was the mailing by the insured to the insurance company of a communication requesting coverage as to a particular shipment of goods. Premiums and losses under the contract were payable in New York. It was held that Louisiana could not regulate such a contract where it "was made beyond the territory of the State of Louisiana, and the only thing that the facts show was done within that State was the mailing of a letter of notification . . . which was done after the principal contract had been made." (165 U.S. at p. 587.)

In *St. Louis Cotton Compress,* a statute of Arkansas imposed a tax of five percent on gross premiums paid to companies not authorized to do business in that state, which was three percent more than the tax imposed on authorized companies. The cotton compress company, a Missouri corporation authorized to do business in Arkansas, contracted and paid for a policy of fire insurance in Missouri covering its property in Arkansas. Holding the statute, as applied to the particular facts, violative of due process, the court said: "This case is stronger than that of *Allgeyer* in that here no act was done within the State, whereas there a letter constituting a step in the contract was posted within the jurisdiction. It is true that the State may regulate the activities of foreign corporations within the State but it cannot regulate or interfere with what they do outside." (260 U.S. at p. 349.)

In *Connecticut General,* the court also declared void under the due process clause a California statute imposing an annual tax on gross premiums as applied to certain contracts of reinsurance entered into by appellant, a Connecticut corporation licensed to do business in California, with other insurance companies also licensed to do business in this state.

However, the reinsurance contracts were entered into in Connecticut where the premiums were paid and where any losses were payable. The court observed that "California had no relationship . . . to the reinsurance contracts. No act in the course of their formation, performance or discharge, took place there. The performance of those acts was not dependent upon any privilege or authority granted by it, and California laws afforded to them no protection." (303 U.S. at p. 81.)

At this point we turn to examine two other Supreme Court cases decided before the passage of the McCarran Act but after the trilogy of cases just discussed: *Osborn* v. *Ozlin* (1940) 310 U.S. 53 [84 L.Ed. 1074, 60 S.Ct. 758] and *Hoopeston Canning Co.* v. *Cullen* (1943) 318 U.S. 313 [87 L.Ed. 777, 63 S.Ct. 602, 145 A.L.R. 1113], relied upon heavily by plaintiff but rejected with equal fervor by defendants.

In *Osborn* the court sustained the validity of a Virginia statute forbidding insurance companies authorized to do business in that state to make contracts of insurance or surety except through registered resident agents of such companies. Rejecting the claims of foreign insurers licensed in Virginia that the statute deprived them of rights protected by the Fourteenth Amendment, the court said: "Virginia has not sought to prohibit the making of contracts beyond her borders. She merely claims that her interest in the risks which these contracts are designed to prevent warrants the kind of control she has here imposed. This legislation is not to be judged by abstracting an isolated contract written in New York from the organic whole of the insurance business, the effect of that business on Virginia, and Virginia's regulation of it." (310 U.S. at pp. 62-63.) The court distinguished *Allgeyer* stating that although some doubts had been cast upon that case (see also Note (1962) 76 Harv.L.Rev. 152, 153), the statute in *Allgeyer* "was thought to be directed not at the regulation of insurance within the state, but at the making of contracts without." (P. 67.)

In *Hoopeston*, the issue was whether reciprocal fire insurance associations whose attorneys-in-fact were located in Illinois could constitutionally be made subject to New York laws as a condition of insuring property in that state. Under the pertinent facts a canner or wholesale grocer in New York would sign an application to become a subscriber and send it to the attorney-in-fact in Illinois. If the risk were accepted the applicant would sign and send to the attorney-in-fact a power of attorney and an application. The policy was then

issued by the attorney-in-fact and mailed to the subscriber in New York. On occasions insurance engineers were sent to New York to investigate the risk or the loss. The contracts reserved the right of the reciprocals to go into New York to repair or replace lost or damaged property.

It was urged that the statute as applied to the reciprocals was unconstitutional since the contracts of insurance were signed in Illinois and losses were paid by checks mailed from that state. Rejecting this contention, the court said that "the issue remains whether the insurance enterprise as a whole so affects New York interests as to give New York the power it claims.

"In determining the power of a state to apply its own regulatory laws to insurance business activities, the question in earlier cases became involved by conceptualistic discussion of theories of the place of contracting or of performance. [Fn. citing *Allgeyer*.] More recently it has been recognized that a state may have substantial interests in the business of insurance of its people or property regardless of these isolated factors. This interest may be measured by highly realistic considerations such as the protection of the citizen insured or the protection of the state from the incidents of loss. . . .

"The actual physical signing of contracts may be only one element in a broad range of business activities. . . ." (318 U.S. at pp. 316-317.)

Distinguishing *Allgeyer*,[8] the court concluded that "in determining whether insurance business is done within a state for the purpose of deciding whether a state has power to regulate the business, considerations of the location of activity prior and subsequent to the making of the contract, *Osborn* v. *Ozlin, supra,* of the degree of interest of the regulating state in the object insured, and of the location of the property insured are separately and collectively of great weight." (P. 319.)

Finally we return to *State Board of Insurance* v. *Todd Shipyards Corp., supra,* 370 U.S. 451. In *Todd,* as we have said, the court passed upon the constitutionality of a Texas statute imposing a five percent premium tax on policies purchased from an insurer not licensed in Texas covering

---

[8] *Allgeyer* was distinguished as inapplicable to situations where the business of insurance sought to be regulated had many actual contacts with the regulating state. The comment has been made that *Hoopeston* thus limited *Allgeyer* to its facts. (See Note (1963) 61 Mich. L. Rev. 1171, 1173.)

risks in that state. The insurers were not licensed to do business in Texas, had no offices or agents there and neither solicited business nor investigated risks or claims in that state. The insured was a New York corporation doing business in Texas; the insured property was located there. All insurance transactions, including the negotiation and payment of the insurance, the issuance of the policies and the adjustment and payment of losses—took place outside Texas. In affirming the Texas decision holding the statute unconstitutional the court observed that unlike *Osborn* and *Hoopeston* the insurance companies carried on no activities in Texas and that the "only connection between Texas and the insurance transactions is the fact that the property covered by the insurance is physically located in Texas." (370 U.S. at p. 455.)

If, therefore, as seems required, we examine the pre-McCarran decisions for guidelines of due process in this type of case, we discern two separate yet consistent trends of decision. The first, exemplified by the earlier trilogy of cases (*Allgeyer, St. Louis Cotton* and *Connecticut General*) emphasized the place of making the contract sought to be taxed or regulated and, having found all activities relevant to the making and carrying out of the contract to have occurred outside the regulating state, invalidated all efforts of the latter to control them. The second, exemplified by the later cases of *Osborn* and *Hoopeston*, laid emphasis on the contacts with the regulating state arising from the transactions involved and the interest of the state in such transactions consequent upon such relationship. Indeed, as we have already pointed out, the court itself in *Hoopeston* recognized such distinct philosophies expounding in the first instance a "conceptualistic discussion of theories of the place of contracting or of performance" and in the second the state's "substantial interests in the business of insurance of its people or property *regardless of these isolated factors.*" (Italics added.) (318 U.S. at p. 316.) We say that these trends of decision are consistent because upon analysis the first category of cases actually represents situations where there were no contacts sufficient to support the jurisdiction of the regulating state.

We have therefore concluded that within the framework of the McCarran Act and in accordance with principles of due process prior thereto, interstate insurance transactions may properly be regulated when they have sufficient contacts with the regulating state so as to give the latter a substantial interest in the transactions. Such regulation, though predi-

cated on a variety of factual circumstances, will be upheld if kept within the limits of *Allgeyer, St. Louis Cotton* and *Connecticut General* which define only the outer boundaries of due process. This trilogy of cases merely tells us that where there are no activities within the regulating state (*Allgeyer* v. *Louisiana, supra,* 165 U.S. 578; cf. *State Board of Insurance,* v. *Todd Shipyards Corp., supra,* 370 U.S. 451) regulation will not meet due process tests. We therefore reject the thesis of defendants herein that the issue now before us must turn on the presence of agents in the regulating state: that where agents are present, regulation is permissible but where, as in the instant cases, agents are not present, regulation cannot be upheld even though other contacts between the insurer and the insured have been established through the mails.

Our foregoing conclusion finds cogent support in *Ministers Life & Casualty Union* v. *Haase* (1966) 30 Wis.2d 339 [141 N.W.2d 287], appeal dismissed 385 U.S. 205 [17 L.Ed.2d 301, 87 S.Ct. 407]. There the plaintiff insurance company, a Minnesota corporation not licensed to do business in Wisconsin attacked a comprehensive regulating and taxing law of the latter state upon the ground *inter alia* that it was violative of due process. There, as in the instant case, the insurer had no office, officer, bank account or real estate in the regulating state. It solicited business through advertisement in national and other publications and by direct mail. In the case of individual policies, upon receiving an inquiry the insurer would mail an application to the prospect who would complete and return it to the Minnesota home office. The policy would then be mailed to the applicant who would become a member of Ministers upon delivery and acceptance. All premium notices were mailed from the home office and all premiums were payable and received there.

In the case of group insurance, the group-prospect in Wisconsin would select a group leader who would negotiate with the insurer for the policy and would receive the literature and necessary forms. The group leader enrolled the members, received the master policy and premium notices for the group, and collected and remitted the premiums, individual members received a certificate of insurance. In respect to some group insurance, each member received from the insurer by mail individual policies and premium notices. Group leaders were not compensated and did not handle claims.

After reviewing the McCarran Act and the pertinent decisions on due process announced prior thereto, the Wisconsin

Supreme Court sustained the statute in question, observing:
"We think *Osborn* and *Hoopeston* are sufficient authority for
Wisconsin's jurisdiction to regulate the type of insurance
business presented by the instant facts and represent the
prevailing view of the jurisdiction to tax and regulate an
insurance business within the limits of due process." (141
N.W.2d at p. 294.) Regulation was posited on the interest
which Wisconsin had in the transactions because of the
contacts with that state. Said the court: "Here, we have a
systematic solicitation of insurance by mail, not sporadic but
continuous, and in addition, group leader's solicitations.[9]
. . . Ministers has 'realistically entered the state looking for
and obtaining business.' . . . In common parlance and in any
enlightened sense, it cannot be said that Ministers does not do
business in Wisconsin." (P. 295.)

Ministers' appeal to the United States Supreme Court was
dismissed by that court for want of a substantial federal ques-
tion. (*Ministers Life & Casualty Union* v. *Haase* (1966) 385
U.S. 205 [17 L.Ed.2d 301, 87 S.Ct. 407].) At oral argument
before us counsel for defendants conceded that such dismissal
was a determination of that case on the merits and had res
judicata effect. (*Ohio* ex rel. *Eaton* v. *Price* (1958) 360 U.S.
246, 247 [3 L.Ed.2d 1200, 79 S.Ct. 978]; *Two Guys from
Harrison-Allentown, Inc.* v. *McGinley* (E.D. Pa. 1959)
179 F.Supp. 944, 949; see (1949) 62 Harv.L.Rev. 488, 489,
494.) They recognized at the same time that the case acquired
some precedential value although they urged that it was
exceedingly limited. We decline to give *Ministers* such grudg-
ing acceptance. In our view, it is persuasive authority in the
resolution of the issue before us.

Nor are we impelled to abandon or modify our conclusions
as to the applicable criteria of due process in these cases
because of the decision in *Minnesota Commercial Men's Assn.*
v. *Benn* (1923) 261 U.S. 140 [67 L.Ed. 573, 43 S.Ct. 293],
cited to us by defendants and heavily relied upon by them as
an authority "of particular significance." There the court
declared void for want of jurisdiction a Montana judgment
obtained upon substituted service on the Secretary of State
and Insurance Commissioner of Montana against a Minnesota
insurance company engaged in the mail order insurance busi-

---

[9]The court continued: "We need not consider group leaders as agents
but even Ministers should admit they are significant contacts which were
encouraged to work for Ministers' benefit and which were relied upon as
a method of doing business." (P. 295.)

ness with offices only in its home state. The Supreme Court held that the Minnesota insurer was not doing business in Montana and could not be deemed to be "present" there because local members solicited new prospects.

Defendants herein argue that *Benn* is applicable to the cases at bench "a fortiori" for two reasons: (a) Since *Benn* denied *service of process* jurisdiction over a foreign direct mail insurer, it constitutes even more persuasive authority against jurisdiction to *regulate* where more substantial contacts with the regulating state are required (citing *Jeter* v. *Austin Trailer Equipment Co.* (1953) 122 Cal.App.2d 376, 381 [265 P.2d 130]) ; and (b) since *Benn* involved solicitation by mail and also solicitation by members within the state and since these two forms of solicitation failed to support even *service of process* jurisdiction, solicitation by mail alone, as in the instant cases, cannot possibly suffice to confer jurisdiction *to regulate*.

Unfortunately for defendants both "a fortiori" arguments depend upon the continued validity and acceptance of the holding in *Benn* and must succumb to the same fate which *Benn* has met in later decisions. A complete answer to any claim for the validity of *Benn* is found in the following language of the Wisconsin Supreme Court in *Ministers*: "*Benn's* 'presence concept' of doing business may be conceded to no longer have vitality in the field of jurisdiction for service of process in view of *International Shoe Co.* v. *State of Washington* (1945) 326 U.S. 310 [90 L.Ed. 95, 66 S.Ct. 154, 161 A.L.R. 1057], whose minimum-contact theory of jurisdiction was proclaimed only a few years after the decision in *Osborn* and *Hoopeston* in the related field of states' jurisdiction to tax and regulate. In fact, *Travelers Health Association* v. *Commonwealth of Virginia* (1950) 339 U.S. 643 [94 L.Ed. 1154, 70 S.Ct. 927], in reference to an argument that *Benn* was controlling, said, quoting *Hoopeston,* '[W]e rejected the contention, based on the *Benn* case among others, that a state's power to regulate must be determined by a "conceptualistic discussion of theories of the place of contracting or of performance." Instead we accorded "great weight" to the "consequences" of the contractual obligations in the state where the insured resided and the "degree of interest" that state had in seeing that those obligations were faithfully carried out.' " (141 N.W.2d at p. 294.)

■ Applying due process criteria which give recognition to the substantial interest of the regulating state in the insurance transactions involved, we are satisfied that in the circum-

stances of the instant cases there are sufficient contacts with California to justify regulation. The insureds are, of course, residents of California. The solicitation of insurance actually takes place in California where the advertising material and other forms are received by the individual addressees. Thus realistically viewed the insurer through the instrumentality of the mail is for all practical purposes soliciting insurance here as manifestly as if it were to carry on such solicitation through representatives physically present within this state. (See *Golden & Co.* v. *Justice's Court* (1914) 23 Cal.App. 778, 793-794 [140 P. 49] ; *People* v. *Fairfax Family Fund, Inc.* (1964) 235 Cal.App.2d 881, 885 [47 Cal.Rptr. 812].) In response to this solicitation, California residents complete and sign in this state the applications for insurance. Indeed, defendant United sends to the California addressee a pre-indorsed policy which becomes effective *in this state,* when the policyholder deposits in the mail here the completed ''owner-ship application'' for return to United's home office.[10] In all instances payment of premiums is made by California residents from funds or bank accounts located in California. It is clear that any claims made under the policies will most likely be investigated in this state and that any litigation in connection with the policies will undoubtedly be commenced in California courts. It is also forseeable that should defendants for any reason fail to perform their obligations in accordance with the policies, California might be called upon to provide assistance for the persons within its borders who were intended to be financially assisted by the benefits under the policies.

In short, these defendants have '' 'realistically entered the state looking for and obtaining business' '' (*Ministers Life & Casualty Union* v. *Haase, supra,* 141 N.W.2d at p. 295) ; the main aspects of their insurance transactions are in this state; and to say that they are not doing business here ''is to completely ignore the facts of life and reality.'' (*People* v. *Fairfax Family Fund, Inc., supra,* 235 Cal.App.2d 881, 885.) We think the substantial interest of California in these transactions is obvious.

The cases before us are easily distinguishable from *All-geyer, St. Louis Cotton* and *Connecticut General* where

---

[10]Without derogating from the People's cases against Pioneer and National, this circumstance constitutes an additional contact in the case against United. We are not persuaded by the claim of United's counsel at oral argument that this is a factor without significance in the United case.

nothing was done by the insurance companies within the regulating states. None of these cases reached the question, here crucial, of solicitation by mail sent into the regulating state. Contrary to defendants' claims, our conclusions in these cases are not in conflict with *Todd*. As we have explained, in that case as in *Allgeyer* all of the insurance transactions took place outside the regulating state (Texas), the only contact between Texas and the transactions being the insured property located in Texas. *Todd,* like *Allgeyer,* involved no solicitation by mail and while the insured property appears to be a contact, it is not within our province to question the Supreme Court's evaluation of this contact as supportive of a substantial state interest. As we have said, the facts of the instant cases approximate those in *Ministers* and while *Ministers,* unlike the present cases, involved group leaders, this circumstance at best furnished merely an additional contact in that case. (See fn. 9, *ante.*) At oral argument before us, defendants contended that such group leaders were in effect agents of the insurer in the regulating state and argued that the dismissal of the appeal by the United States Supreme Court was on such basis. The instant parties have made available to us copies of the briefs and other pertinent records filed in the United States Supreme Court in connection with the motion to dismiss. Our examination of these has failed to disclose that the motion to dismiss in *Ministers* was argued on the issue that the group leaders were the insurer's agents.

Having concluded that California may constitutionally regulate these transactions, we turn to consider whether they fall within the regulatory reach of section 700.[11] As appears below, under this statute a person shall not *transact* any class of insurance business *in this state* without first obtaining a certificate of authority from the commissioner. Section 35 provides : " 'Transact' as applied to insurance includes any of the following: (a) Solicitation. (b) Negotiations preliminary to execution. (c) Execution of a contract of insurance. (d) Transaction of matters subsequent to execution of the contract and arising out of it."

---

[11]Section 700 provides in relevant part: "A person shall not transact any class of insurance business in this State without first being admitted for such class. Such admission is secured by procuring a certificate of authority from the commissioner. Such certificate shall not be granted until the applicant conforms to the requirements of this code and of the laws of this State prerequisite to its issue. After such issue the holder shall continue to comply with the requirements as to its business set forth in this code and in the laws of this State. . . ."

As we have already explained, we think it is clear that defendants' solicitation of insurance takes place in California where their advertising and other materials are received through the instrumentality of the mails. (See *Golden & Co.* v. *Justice's Court, supra,* 23 Cal.App. 778, 793-794.) At the same time, the receipt of such material in this state constitutes "Negotiations preliminary to execution" of the contracts of insurance. It seems to us an ineluctable conclusion that through such "solicitation" and such "negotiations preliminary to execution" defendants "transact . . . insurance business in this State." (§§ 35, 700.)

Defendants contend that section 700 was never intended to apply to insurance transactions negotiated by mail across state lines. However, the statute is cast in broad language and in our view indicates a legislative intent to exercise a plenary power of regulation over insurance transactions in this state, howsoever effectuated. It is settled that "the business of insurance is affected with a public interest" (*Carpenter* v. *Pacific Mut. Life Ins. Co.* (1937) 10 Cal.2d 307, 329 [74 P.2d 761]) and that there is a duty upon the Insurance Commissioner of this state "to protect the rights of all insurance policyholders." (*Caminetti* v. *State Mut. Life Ins. Co.* (1942) 52 Cal.App.2d 321, 324 [126 P.2d 165].) Like its predecessor statute (Pol. Code, § 596) on which it is based, section 700 is "applicable to insurance companies of all types, domestic as well as foreign." (*Connecticut Gen. Life Ins. Co.* v. *Johnson* (1935) 3 Cal.2d 83, 89 [43 P.2d 278].) In respect to insurance companies organized in other states which transact business here, the requirements of section 700 are "designed to secure an examination by the Insurance Commissioner to determine, among other things, the solvency of such organizations." (*Samson* v. *State of California* (1942) 55 Cal.App.2d 194, 196 [130 P.2d 452].) In the face of what we think is its clear objective, namely to protect the people of California and "to provide for the welfare of the people, in affording security to them in such insurance as they may choose to effect upon their property, and to protect them against fraudulent schemes of insurance, or deception by plausible inducements which may be held out for their patronage." (*State Inv. & Ins. Co.* v. *Superior Court etc. of San Francisco* (1894) 101 Cal. 135, 145 [35 P. 549]), to posit, as defendants urge, a restricted field of regulation for the statute would be to impair its efficacy and thwart its objective. Support for our conclusion is found "in the rule that a

statute must be construed with reference to the object to be accomplished. . . ." (*In re Petraeus* (1939) 12 Cal.2d 579, 583 [86 P.2d 343] and cases there collected; see also *Golden & Co.* v. *Justice's Court, supra,* 23 Cal.App. 778, 794.) We are guided by the fundamental rule "that the objective sought to be achieved by a statute as well as the evil to be prevented is of prime consideration in its interpretation." (*Rock Creek etc. Dist.* v. *County of Calaveras* (1946) 29 Cal.2d 7, 9 [172 P.2d 863]; *Freedland* v. *Greco* (1955) 45 Cal.2d 462, 467 [289 P.2d 463].)

■ Defendants urge however that "long continued administrative construction" impels our conclusion that section 700 is inapplicable. They invoke the rule that " ' [T]he contemporaneous administrative construction of the enactment by those charged with its enforcement and interpretation is entitled to great weight, and courts generally will not depart from such interpretation unless it is clearly erroneous or unauthorized.' [Citations.] " (*Richfield Oil Corp.* v. *Crawford* (1952) 39 Cal.2d 729, 736 [249 P.2d 600].)

In support of their position defendants direct our attention to a letter emanating in 1961 from the Compliance and Legal Division of the Department of Insurance stating in substance that California did not and could not constitutionally regulate the transaction of insurance by mail.[12] In reply, the Attorney General directs our attention to an opinion of his predecessor (Ops.Cal.Atty.Gen. No. 6386) rendered in 1928 at the request of the commissioner which interpreted Political Code section 596 (the predecessor statute of § 700) as being applicable to insurance business solicited by mail addressed to California residents from outside this state. Defendants on the other hand argue that for almost thirty years neither the Department of Insurance nor the Attorney General attempted to regulate transactions such as those now presented or to apply section 700 to them.

Assuming these conditions existed, nevertheless, while recognizing the weight to which they may be entitled, we are not persuaded that they should prevail over the clear broad reach of the statute as construed in the light of its objectives. It is manifest that in 1928 the Attorney General *was* of the

---

[12]The letter dated April 19, 1961, by J. N. Andrews, assistant chief of said division and addressed to a person in the State of Pennsylvania states: "The laws of this State do not and it is our understanding that they could not constitutionally regulate the transaction of insurance through the United States mails."

opinion that the statute applied and so advised the then commissioner. If, despite this opinion, the department's subsequent policy was as reflected in its 1961 letter referred to above, we think its continued forbearance of little value as an aid to construction, since such inaction appears to have been the result of a misapprehension as to the constitutionally permissible limits of state regulation. (See fn. 12, *ante.*) As we have shown, transactions such as the instant ones *may* be constitutionally regulated by California. Therefore "an erroneous administrative construction does not govern the interpretation of a statute." (*Estate of Madison* (1945) 26 Cal.2d 453, 463 [159 P.2d 630].) "Mere failure to act, however, does not constitute an administrative construction" (*Estate of Madison, supra*) and the failure in the past of any of the officers of this state charged with the responsibility of enforcing section 700 to apply it to transactions like the present ones will not estop the People from doing so at some time thereafter. (*Caminetti* v. *State Mut. Life Ins. Co., supra,* 52 Cal.App.2d 321, 326.)

■ Defendants also contend that since "every statute should be construed with reference to the whole system of law of which it is a part" (*Stafford* v. *Realty Bond Service Corp.* (1952) 39 Cal.2d 797, 805 [249 P.2d 241]), an examination of related statutes shows that the Legislature did not intend section 700 to regulate the business carried on by them. They direct our attention to the Unauthorized Insurers Process Act (§§ 1610-1620, added by Stats. 1949, ch. 495) and to the Unauthorized Insurers False Advertising Process Act (§§ 1620.1-1620.7, added by Stats. 1961, ch. 297). The point of defendants' argument is that if section 700 already applied to mail order insurance these two acts would have been "entirely surplusage."

We find no merit in the point. Both acts are service of process statutes. Sections 1610-1620 provide that specified acts "by mail or otherwise, by a foreign or alien insurer" not admitted to do business in this state shall constitute an appointment by such insurer of the Insurance Commissioner as attorney for the service of process. As the act expressly declares,[13] its purpose was to provide, in addition to existing

---

[13]Section 1 of the act (Stats. 1949, ch. 495, § 1) states: "The purpose of this act is to subject certain insurers to the jurisdiction of courts of this State in suits by or on behalf of insured or beneficiaries under insurance contracts. The Legislature declares that it is a subject of concern that nonadmitted insurers have issued policies of insurance to residents of this State physically present herein at the time of such issu-

methods (§ 1615), a special method of substituted service of process in the light of the McCarran Act.

■ Defendants advance a further argument grounded on section 1616 which prohibits the filing of any pleading by any nonadmitted foreign or alien insurer unless it either (1) procures a certificate of authority *or* (2) deposits cash or securities or files a bond to secure payment of any final judgment. Defendants' point here is that since the foreign insurer has the option of either alternative it can in fact appear in the litigation without procuring a certificate of authority at all and that therefore we must conclude that section 700, which requires such certificate, was not intended to be applicable. We do not agree. In our view, section 1616 merely offers the above alternatives to all such insurers, not only those who complied with section 700 by obtaining a certificate, but also to those who failed to comply with that section.

The second group of sections (§§ 1620.1-1620.7) referred to by defendants appears to have been enacted with the same general purpose[14] and can be explained in the same way. Like the sections first considered, these provide for an additional method of substituted service of process. However, defendants

ance, thus presenting to such residents the often insuperable obstacle of resorting to distant forums for the purpose of asserting legal rights under such policies; that this State has an interest in providing to its residents a convenient forum for the purpose of asserting and enforcing legal rights under such policies; that if such residents are left to seek remedy in distant forums they will be, for practical purposes, without remedy. In furtherance of such state interest, the Legislature herein provides a method of substituted service of process upon such insurers and declares that in so doing it exercises its power to protect its residents and to define, for the purpose of this statute, what constitutes doing business in this State, and also exercises powers and privileges available to the State by virtue of Public Law 15, 79th Congress of the United States, Chapter 20, First Session, S. 340, as amended, which declares that the business of insurance and every person engaged therein shall be subject to the laws of the several states.''

[14]In this instance we find in section 1620.1 a declaration of purpose substantially the same as that set forth for sections 1610-1620. Subdivision (a) of section 1620.1 provides: ''The purpose of this article is to subject to the jurisdiction of the commissioner and to the jurisdiction of the courts of this State, insurers not authorized to transact business in this State which place in or send into this State any false advertising designed to induce residents of this State to purchase from insurers not authorized to transact business in this State. The Legislature declares it is in the interest of the citizens of this State who purchase insurance from insurers which solicit insurance business in this State in the manner set forth in the preceding sentence that such insurers be subject to the provisions of this article. In furtherance of such state interest, the Legislature in this article provides a method of substituted service of process upon such insurers and declares that in so doing, it exercises its power to protect its residents and also exercises powers and privileges available to the State by virtue of Public Law 15, 79th Congress of the

make much of the fact that their purpose is also "to subject to the jurisdiction of the commissioner" (see fn. 14, *ante*) nonadmitted foreign insurers which place or send into California any false advertising. As the Attorney General points out to us, these statutes manifest the purpose of exercising the power conferred on the states by the McCarran Act (15 U.S.C.A. § 1012, subd. (a)) which we have heretofore discussed. The McCarran Act also provided that the Federal Trade Commission should have the power to regulate false and deceptive insurance advertising across state lines "to the extent that such business is not regulated by State law." (15 U.S.C.A. § 1012, subd. (b).) Subsequent decisions raised some question as to the efficacy of state regulation absent a specific statement therein of an intention to regulate false and deceptive advertising. (*Federal Trade Com.* v. *National Cas. Co.* (1958) 357 U.S. 560 [2 L.Ed.2d 1540, 78 S.Ct. 1260] ; *Federal Trade Com.* v. *Travelers Health Assn.* (1960) 362 U.S. 293 [4 L.Ed.2d 724, 80 S.Ct. 717].) It appears to us that the sections under examination were enacted so as to make clear that California was exercising the specific regulatory power envisioned by the McCarran Act. Furthermore, we note that section 1620.1 states that "the authority provided in such sections to be in addition to any existing powers of this State." We fail to discern in either of the above two arguments any inconsistency with section 700 which derogates from the broad scope of that statute.

For the foregoing reasons we have concluded that section 700 applies to the transactions involved in the cases before us. Our previous discussion herein of the McCarran Act and the events leading up to its enactment should set at rest any question of conflict between section 700 and any federal statute.

Finally defendants express some concern as to the impact of our conclusions on their present California policyholders. The interests of those who currently hold policies contracted for with heretofore unauthorized insurance companies were considered in reaching this decision, and we have concluded that they will not be adversely affected. Some few jurisdictions hold such policies to be unenforceable by insured persons (e.g., *Jackson* v. *Mutual Fire Ins. Assn.* (1922) 154

---

United States, Chapter 20, 1st Session, S. 340, which declares that the business of insurance and every person engaged therein shall be subject to the laws of the several states; the authority provided in such sections to be in addition to any existing powers of this State."

Ark. 342 [242 S.W. 567]; *United American Ins. Co.* v. *Union Fire Ins. Co.* (1927) 82 Colo. 72 [257 P. 246]). A similar rule once existed in California by force of a statute declaring such policies "null and void" (Pol. Code, § 596), but the Legislature repealed that provision in 1917 (Stats. 1917, ch. 106, p. 150).[15] The majority of jurisdictions hold that such policies may be enforced by the insured. (E.g., *Pennypacker* v. *Capital Ins.Co.* (1890) 80 Iowa 56 [45 N.W. 408, 26 Am.St. Rep. 395, 8 L.R.A. 236]; *Walters* v. *Western Automobile Ins. Co.* (1924) 116 Kan. 404 [226 P. 746]; *Winston-Norris Co.* v. *King* (1926) 119 Okla. 109 [249 P. 319]; *Roane* v. *Union Pac. Life Ins. Co.* (1913) 67 Ore. 264 [135 P. 892]; *United Services Automobile Assn.* v. *Zeller* (Tex. Civ.App. 1939) 135 S.W.2d 161.)

The insurance industry is regulated primarily for the benefit of those who make use of the services the industry offers. Penalties are imposed on those members of the industry who violate the regulatory scheme (e.g., §§ 761, 779.22, 782, 790.07), but the Insurance Code places no penalties, or even duties, on insured persons. In fact, no practical method exists for a member of the protected class of insureds to ascertain whether his insurer has complied with the applicable regulations. We reject imposition of the minority rule that would allow an insurer who has issued policies and collected premiums in violation of the law to avoid obligations to the detriment of innocent members of the protected class. (*McConnell* v. *Underwriters at Lloyds of London* (1961) 56 Cal.2d 637, 643-644 [16 Cal.Rptr. 362, 365 P.2d 418]; cf. *Goldstone* v. *Columbia Life & Trust Co.* (1917) 33 Cal.App. 119, 121-122 [164 P. 416].)

The judgments are reversed and the causes are remanded to the trial court for further proceedings in conformity with the views herein expressed.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., and Burke, J., concurred.

---

[15]Political Code section 596, the predecessor to section 700, contained the following provision until 1917: "All policies and other contracts of insurance, issued without full compliance by all parties concerned with the laws of this state, shall be null and void." In 1917 that language was repealed and was replaced with: "Nothing in this section shall be construed to deprive any citizen of this state of the right to negotiate and effect insurance on his own property." (Stats. 1917, ch. 106, p. 150.) Upon the enactment of the Insurance Code in 1935 section 700 incorporated much of the substance of Political Code section 596. However, it contained no reference to the validity of an "illegal" policy.