NATIONAL LIBERTY LIFE INSURANCE COMPANY, Appellant,
v. STATE, Respondent.*

*No. 246.  Argued January 3, 1974.—Decided February 25, 1974.*
(Also reported in 215 N. W. 2d 26.)

* Motion for rehearing denied, without costs, on June 4, 1974.

348

350

For the appellant there were briefs by *Robert K. Aberg* and *Aberg, Bell, Blake & Metzner,* all of Madison, attorneys, and *Morrison, Foerster, Holloway, Clinton & Clark* of San Francisco, California, of counsel, and oral argument by *Robert K. Aberg* of Madison and *Ervin N. Griswold* of Washington, D. C.

For the respondent the cause was argued by *John E. Armstrong,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

For the appellant a brief was filed by *Robert K. Aberg* and *Aberg, Bell, Blake & Metzner, S. C.*, all of Madison, and *Erwin N. Griswold* and *Reavis, Pogue, Neal & Rose*, all of Washington, D. C., attorneys; and *Franklin C. Latcham* and *Morrison, Foerster, Holloway, Clinton & Clark*, all of San Francisco, California, and *William A. Patty* of Valley Forge, Pennsylvania, of counsel.

For the respondent a brief was filed by *Robert W. Warren*, attorney general, and *John E. Armstrong*, assistant attorney general.

A brief amicus curiae was filed by *Donald J. Schuenke, Michael J. Jones* and *Steven E. Schmidt*, all of Milwaukee, for the Northwestern Mutual Life Insurance Company.

A brief amicus curiae was filed by *H. James Douds* and *William N. Albus*, attorneys, and *Roland L. Panneton* of counsel, all of Washington, D. C., for The National Association of Life Underwriters and the Wisconsin Association of Life Underwriters.

WILKIE, J. Two controlling issues are presented on this appeal:

1. Does the application of sec. 201.42 (11) (a), Stats. 1969, to National constitute the taking of property without due process of law contrary to the guarantees of the fourteenth amendment to the United States Constitution?

2. If the state of Wisconsin can constitutionally apply a general revenue tax to the applicant, is sec. 201.42 (11) (a), Stats. 1969, nonetheless unconstitutional for failure to apportion the tax on the basis of that activity conducted in the state of Wisconsin as opposed to that activity conducted outside the state of Wisconsin which combine to produce the gross receipts upon which the tax is levied?

*Due process objections.*

National is not contesting the constitutionality of sec. 201.42, Stats. 1969, but it is contesting the constitutionality of the application of sub. (11) (a) to itself. National recognizes that this court upheld the constitutionality of the regulatory and taxation aspects of sec. 201.42 in *Ministers Life & Casualty Union v. Haase*,[3] but points out that the court recognized that the constitutionality of the application of the statute will vary with the fact situation:

". . . We do not hold, however, that any one single act defined as doing business in the state in sec. 201.42, Stats., is alone sufficient for the application of the section to a given business. Each set of facts must be considered on its own merits when applying the statute." [4]

National asserts that there must be some "physical presence" of a corporation within the taxing state, such as an office, retail outlet, agents, representatives or quasi agents, to give a state constitutional jurisdiction to impose a tax. National finds that the presence of "group leaders" in *Ministers* satisfied the requirement of "physical presence" within the taxing state, but that in this case there is absolutely no physical presence sufficient to support the imposition of a general revenue tax.

National asserts that the "minimum contacts" necessary to support due process jurisdiction for service of process, police power regulation, and general revenue taxation differ and that a more stringent test is necessary to validate a power to tax a foreign corporation. National feels that a series of cases culminating in *National Bellas Hess v. Department of Revenue* [5] indicate that in order for the constitutional imposition of a tax

[3] (1966), 30 Wis. 2d 339, 141 N. W. 2d 287.

[4] *Id.* at page 361.

[5] (1967), 386 U. S. 753, 87 Sup. Ct. 1389, 18 L. Ed. 2d 505.

on a "mail-order" business there must be some physical presence of the corporation within the taxing state. National also contends that this test or standard applies, without exception, to all mail-order businesses including the sale of insurance.

The position of National is well-phrased in a recent legal periodical: [6]

"Accordingly, presence through an agent or a place of business is a prerequisite to the imposition of a general revenue measure. And it makes no difference, in this connection, what the nature of the business is. In this respect taxation differs from regulation. Contacts that would justify *regulatory* provisions as to one type of business might not as to another because of the greater interest of the state in the former than in the latter. Thus, a state can properly regulate an insurance business based upon contacts which would not support regulation of a greeting card business, for example. But when it comes to general revenue taxation the question is whether the taxpayer is present so that the state is called upon to provide anything for which it may constitutionally require a tax contribution. Here the nature of the business becomes unimportant."

In support of its contention that taxation requires greater state contacts to justify it, National cites *Freeman v. Hewit*.[7] In that case the United States Supreme Court said:

". . . A police regulation of local aspects of interstate commerce is a power often essential to a State in safeguarding vital local interests. . . . State taxation falling on interstate commerce, on the other hand, can only be justified as designed to make such commerce bear a fair share of the cost of the local government whose protection it enjoys. But revenue serves as well no matter what its source. To deny to a State a particular source of income because it taxes the very process of in-

---

[6] William A. Patty, *State Premium Taxes on Mail Order Insurance Under the Due Process Clause*, 22 Tax Lawyer (1969), 363, 369, 370.

[7] (1946), 329 U. S. 249, 253, 254, 67 Sup. Ct. 274, 91 L. Ed. 265.

terstate commerce does not impose a crippling limitation on a State's ability to carry on its local function. Moreover, the burden on interstate commerce involved in a direct tax upon it is inherently greater, certainly less uncertain in its consequences, than results from the usual police regulations. The power to tax is a dominant power over commerce. Because the greater or more threatening burden of a direct tax on commerce is coupled with the lesser need to a State of a particular source of revenue, attempts at such taxation have always been more carefully scrutinized and more consistently resisted than police power regulations of aspects of such commerce. The task of scrutinizing is a task of drawing lines. This is the historic duty of the Court so long as Congress does not undertake to make specific arrangements between the National Government and the States in regard to revenues from interstate commerce."

The analysis in this quotation is clearly based on the restrictions of the commerce clause. One recurring problem in analyzing supreme court decisions on the permissibility of taxation and regulation of foreign corporations is the failure of the supreme court to clearly distinguish between restrictions on state power based on the commerce clause and those based on the due process clause of the fourteenth amendment. In the case of the insurance business, *Prudential Ins. Co. v. Benjamin* [8] establishes that the McCarran Act has removed any objections to state regulation or taxation of insurance based on the commerce clause. Therefore, any restrictions on the power of the states over the insurance business must rest on the vague requirements of the due process clause. The McCarran Act appears to be the type of specific congressional act referred to by the supreme court in the *Freeman Case* and makes the language of that case inapplicable to the present situation.

Another case relied on heavily by National is *Norton Co. v. Department of Revenue.* [9] In *Norton* the United States Supreme Court held that a gross receipts tax on

[8] (1946), 328 U. S. 408, 66 Sup. Ct. 1142, 90 L. Ed. 1342.
[9] (1951), 340 U. S. 534, 71 Sup. Ct. 377, 95 L. Ed. 517.

all sales to persons in Illinois made by a Massachusetts corporation with its factory and head office in Massachusetts, but with a branch office in Illinois, was partially unconstitutional. The supreme court validated a tax on those sales which were processed by the local office, but held the tax could not be applied to those sales attributable to direct mail orders to the company at its Massachusetts headquarters and delivery to the Illinois customers through the channels of interstate commerce. This was despite the probability that some form of advertising must have solicited the requests for merchandise. The supreme court stated in that case:

"Where a corporation chooses to stay at home in all respects except to send abroad advertising or drummers to solicit orders which are sent directly to the home office for acceptance, filling, and delivery back to the buyer, it is obvious that the State of the buyer has no local grip on the seller. Unless some local incident occurs sufficient to bring the transaction within its taxing power, the vendor is not taxable." [10]

And finally the case on which National principally relies is *National Bellas Hess v. Department of Revenue.*[11] In that case the appellant was a mail-order house with its principal place of business in Missouri. It had no tangible property in Illinois, no sales outlets, representatives, telephone listing or solicitors in that state and did not advertise by radio, television or newspapers. It obtained Illinois customers through catalogues and "flyers" it mailed to residents of Illinois. The orders were sent to its plant in Missouri and delivered to customers by mail or common carrier. By this method National Bellas Hess was able to do a several million dollar business in Illinois and had a mailing list with over 5,000,000 names. However, the United States Supreme Court held that it was a violation of the commerce

---

[10] *Id.* at page 537.
[11] *Supra*, footnote 5.

clause and perhaps the due process clause to impose a duty of use tax collection and payment upon such a seller whose only connection with customers in the state was by common carrier or by mail.

National Bellas Hess claimed that such an imposition violated the due process clause of the fourteenth amendment and created an unconstitutional burden on interstate commerce. The supreme court said:

". . . These two claims are closely related. For the test whether a particular state exaction is such as to invade the exclusive authority of Congress to regulate trade between the States, and the test for a State's compliance with the requirements of due process in this area are similar. See *Central R. Co. v. Pennsylvania,* 370 U. S. 607, 621–622 (concurring opinion of Mr. Justice BLACK). As to the former, the Court has held that 'State taxation falling on interstate commerce . . . can only be justified as designed to make such commerce bear a fair share of the cost of the local government whose protection it enjoys.' *Freeman v. Hewit,* 329 U. S. 249, 253. See also *Greyhound Lines v. Mealey,* 334 U. S. 653, 663; *Northwestern Cement Co. v. Minnesota,* 358 U. S. 450, 462. And in determining whether a state tax falls within the confines of the Due Process Clause, the Court has said that the 'simple but controlling question is whether the state has given anything for which it can ask return.' *Wisconsin v. J. C. Penney Co.,* 311 U. S. 435, 444. See also *Standard Oil Co. v. Peck,* 342 U. S. 382; *Ott v. Mississippi Barge Line,* 336 U. S. 169, 174. The same principles have been held applicable in determining the power of a State to impose the burdens of collecting use taxes upon interstate sales. Here, too, the Constitution requires 'some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax.' *Miller Bros. Co. v. Maryland,* 347 U. S. 340, 344–345; *Scripto, Inc. v. Carson,* 362 U. S. 207, 210–211. See also *American Oil Co. v. Neill,* 380 U. S. 451, 458." [12]

The supreme court noted that National Bellas Hess was liable for the tax whether it was collected from the cus-

---

[12] *Id.* at pages 756, 757.

tomers or not and so the standards applied would seem to govern both the power to regulate and the power to tax. The supreme court then reviewed earlier cases on the validity of use taxes and concluded that:

"In order to uphold the power of Illinois to impose use tax burdens on National in this case, we would have to repudiate totally the sharp distinction which these and other decisions have drawn between mail order sellers with retail outlets, solicitors, or property within a State, and those who do no more than communicate with customers in the State by mail or common carrier as part of a general interstate business. But this basic distinction, which until now has been generally recognized by the state taxing authorities, is a valid one, and we decline to obliterate it." [13]

The majority opinion based its decision very heavily if not entirely on the burdens such use tax collection requirements would have for mail-order sellers like National Bellas Hess if every state with which the company did business imposed a similar duty but with different rates and different administrative requirements.

The dissenters in *National Bellas Hess* (Justices FORTAS, BLACK and DOUGLAS) felt that a realistic approach required a different result. They felt:

"There should be no doubt that this large-scale, systematic, continuous solicitation and exploitation of the Illinois consumer market is a sufficient 'nexus' to require Bellas Hess to collect from Illinois customers and to remit the use tax, especially when coupled with the use of the credit resources of residents of Illinois, dependent as that mechanism is upon the State's banking and credit institutions. Bellas Hess is not simply using the facilities of interstate commerce to serve customers in Illinois. It is regularly and continuously engaged in 'exploitation of the consumer market' of Illinois (*Miller Bros. Co. v. Maryland*, 347 U. S. 340, 347 (1954)) by soliciting residents of Illinois who live and work there and have homes and banking connections there, and who, absent the

[13] *Id.* at page 758.

solicitation of Bellas Hess, might buy locally and pay the sales tax to support their State. . . ." [14]

However, the majority did not feel these "contacts" were sufficient connection with the state to allow this requirement and clearly chose a "physical presence" standard over a vaguer standard based on the degree of exploitation of the consumer market of the state.

The real issue here is whether this line of cases is controlling in the field of insurance. It is not. The *National Bellas Hess Case* is a very unclear mingling of due process and commerce clause standards. It is not clear whether the "physical presence" test is now a due process and commerce clause test or a mixture of both or purely a commerce clause test. In any event, it is clear that the burden which the particular tax placed on interstate commerce strongly influenced the court to strike it down. The premium tax involved in the present case on review does not place a comparable burden on interstate commerce (insurance is interstate commerce). [15] It does not require the same type of administrative burdens involved in keeping track of a tax on each individual sale from a catalogue with over 4,000 individual items. An insurance company ordinarily would have the information of how many policyholders it had in an individual state and what the premium revenue was from that state. A straight percentage figure of that total is all that is required.

The Wisconsin premium tax is also not an isolated general revenue measure. Although it raises general revenue it is part of a complex regulatory scheme covering both licensed and unlicensed, domestic and foreign insurance companies doing business in Wisconsin. The premium tax is designed both to encourage unauthorized insurers to become licensed and to prevent a competitive

[14] *Id.* at pages 761, 762.
[15] *United States v. Underwriters Asso.* (1944), 322 U. S. 533, 64 Sup. Ct. 1162, 88 L. Ed. 1440.

disadvantage to those licensed insurers who do pay a premium tax as well as other taxes. Why should an unauthorized insurer have the benefit of a regulated market without paying anything at all? In *Osborn v. Ozlin* [16] the supreme court highlighted the legitimacy of state interest in the effects on the totality of its regulatory system.

Shepard's Citations does not reveal a subsequent supreme court case in which *National Bellas Hess* has been mentioned. Those state cases which have construed it have applied *National Bellas Hess* to other situations of use tax collection regulations against retail mail-order sellers of tangible property. [17]

In *Ministers Life & Casualty Union v. Haase* [18] we indicated that cases on other types of business are irrelevant to the determination of due process issues in the field of insurance.

". . . The application of the contact concept of jurisdiction to regulate or tax cannot be measured by a mathematical or quantitative rule. Other cases are helpful but generally not controlling or are dispositive, and in such class falls the cases cited by Ministers. Likewise, we refrain from citing cases sustaining regulation or taxing statutes of other types of businesses."

*Ministers* reviewed and discussed the development of cases in the insurance field and concluded that state interest in the field of insurance is an important factor in determining whether the state can assert jurisdiction to regulate and tax consistent with due process. This court said:

". . . It is true, public interest alone is not sufficient to give a state jurisdiction, but great concern and public interest do add significance to contacts which compose the organic whole and are directly related to the regula-

[16] (1940), 310 U. S. 53, 60 Sup. Ct. 758, 84 L. Ed. 1074.
[17] For example, *Club v. Porterfield* (1971), 25 Ohio St. 2d 277, 268 N. E. 2d 272 (invalid as against mail-order book seller).
[18] *Supra*, footnote 3.

tion and which might not otherwise be sufficient to meet the standard of the due-process clause." [19]

In *McGee v. International Life Ins. Co.*[20] the United States Supreme Court upheld a California court's jurisdiction over a foreign insurer who had no office or agent in California, who never solicited in California, nor did any business in California except with respect to the sole policy involved in the case. The supreme court said: "It cannot be denied that California has a *manifest interest* in providing effective means of redress for its residents when their insurers refuse to pay claims." (Emphasis supplied.) [21] In *Hanson v. Denckla* [22] the trend toward expanding state court jurisdiction over nonresidents was halted when the supreme court refused to uphold a Florida court's jurisdiction over a Delaware trust company which was trustee of a trust deed whose creator moved to Florida and executed a will and named beneficiaries of the trust. The Florida court sought to determine the validity of the power of appointment. The supreme court distinguished the *McGee Case* by saying that in *McGee:*

". . . the State had enacted special legislation (Unauthorized Insurers Process Act) to exercise what *McGee* called its 'manifest interest' in providing effective redress for citizens who had been injured by nonresidents engaged in an activity that the State treats as exceptional and subjects to special regulation." [23]

In *Hoopeston Co. v. Cullen,*[24] two insurance companies challenged the jurisdiction of New York to apply its insurance law to them. The supreme court again emphasized the importance of state interest.

---

[19] *Id.* at page 357.
[20] (1957), 355 U. S. 220, 78 Sup. Ct. 199, 2 L. Ed. 2d 223.
[21] *Id.* at page 223.
[22] (1958), 357 U. S. 235, 78 Sup. Ct. 1228, 2 L. Ed. 2d 1283.
[23] *Id.* at page 252.
[24] (1943), 318 U. S. 313, 63 Sup. Ct. 602, 87 L. Ed. 777.

"[T]he issue remains whether the insurance enterprise as a whole so affects New York interests as to give New York the power it claims.

"In determining the power of a state to apply its own regulatory laws to insurance business activities, the question in earlier cases became involved by conceptualistic discussion of theories of the place of contracting or of performance. More recently it has been recognized that a state may have substantial interests in the business of insurance of its people or property regardless of these isolated factors. This interest may be measured by highly realistic considerations such as the protection of the citizen insured or the protection of the state from the incidents of loss." [25]

In concluding, the United States Supreme Court established three considerations for testing "whether insurance business is done within a state" for the purpose of determining a state's power to regulate: (1) "the location of activity prior and subsequent to the making of the contract," (2) "the degree of interest of the regulating state in the object insured," and (3) "the location of the property insured." The supreme court said these factors are "separately and collectively of great weight." [26] The case leaves open the question of to what extent contacts are essential in sustaining a state's power to regulate and tax.

The trial court was correct here in concluding that *Ministers* did not turn on the presence of "group leaders." This was only one of many "contacts" enumerated by this court although this was considered a significant contact. The hallmark case of *International Shoe Co. v. Washington* [27] states the rule that the taxing state has jurisdiction if the insurance company has "certain minimum contacts with it such that [payment of the tax] does not offend 'traditional notions of fair play and substantial justice.' "

[25] *Id.* at page 316.
[26] *Id.* at page 319.
[27] (1945), 326 U. S. 310, 316, 66 Sup. Ct. 154, 90 L. Ed. 95.

The traditional due process standard for upholding taxation is whether "the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state. The simple but controlling question is whether the state has given anything for which it can ask return." [28] Does the unauthorized insurer, National Liberty Life Insurance Company, receive the requisite benefits in the present case? The answer is "Yes." Anything which tends to lessen the danger of accidents, threats to life, and unhealthy conditions redounds to the benefit of companies engaged in either the life insurance or accident and health insurance business.[29] Wisconsin provisions for public health, safety and welfare paid for out of general revenues are benefits enjoyed by National for which it would be fair to expect a contribution. The United States Supreme Court found in *Equitable Life Society v. Pennsylvania* [30] that the protection afforded to policyholders by the taxing state is a factor to be considered in evaluating the issue of whether a particular method of taxation meets due process standards. National asserts in its brief that such benefits are too indirect and are of the nature of the benefits or "contacts" which the supreme court did not find significant in *National Bellas Hess*. However, the benefits from an ordered society are much more directly related to National's business than to the retail sales involved in the *National Bellas Hess Case*.

The presence or absence of an agent in the state is not the sole constitutionally determinative question. In this case there are sufficient other contacts to provide the nexus for the constitutional imposition of the gross pre-

[28] *Wisconsin v. J. C. Penney Co.* (1940), 311 U. S. 435, 444, 61 Sup. Ct. 246, 85 L. Ed. 267.

[29] Hanson and Obenberger, *Mail Order Insurers: A Case Study in the Ability of the States to Regulate the Insurance Business*, 50 Marq. L. Rev. (1966), 175.

[30] (1915), 238 U. S. 143, 35 Sup. Ct. 829, 59 L. Ed. 1239.

miums tax. National, in its complaint, tends to minimize its contacts with Wisconsin. It alleges that it did almost no prepolicy investigation or investigation of claims in Wisconsin. It even alleges that it does not underwrite its accident and health policies.

In a recent case,[31] California sought to enjoin further sales efforts by a mail-order insurer until it obtained a certificate of authority from the state. The company had no agents in California and the sole contacts with policyholders were by mail. The California Supreme Court rejected the contention that the right to regulate turned on presence or absence of "agents" within the state. It said that "realistically viewed the insurer through the instrumentality of the mail is for all practical purposes soliciting insurance here as manifestly as if it were to carry on such solicitation through representatives physically present within this state."[32] Thus California felt that its interest in the regulation of insurance coupled with solicitation efforts and the presence of the insureds was sufficient to sustain the injunctive powers sought by the state in enforcing its insurance code. The appeal in this case as well as in *Ministers* was dismissed by the supreme court.[33] This is considered a decision on the merits although in practical terms it may be of no greater precedential value than a denial of certiorari. But it would indicate a broad attitude toward state regulation and taxation of insurance.

Although the facts in the present complaint do not really give any indication of the extent of the solicitation of business done by the appellant in Wisconsin, Exhibit A attached to the complaint shows that gross premiums

---

[31] *People v. United National Life Ins. Co.* (1967), 66 Cal. 2d 577, 58 Cal. Rptr. 599, 427 Pac. 2d 199.

[32] *Id.* at page 593.

[33] *United National Life Ins. Co. v. California* (1967), 389 U. S. 330, 88 Sup. Ct. 506, 19 L. Ed. 2d 562; *Ministers Life & Casualty Union v. Haase* (1966), 385 U. S. 205, 87 Sup. Ct. 407, 17 L. Ed. 2d 301.

rose from $23,114 in 1963 to $215,000 in 1969 for a total over the years in question of $1,432,479. This indicates a substantial business and establishes a sufficient contact with this state to justify the imposition of a tax on the appellant's business in Wisconsin especially in view of the fact that the premium tax in question is part of a much larger regulatory program aimed at unauthorized insurers and enacted to protect Wisconsin citizens in an area of recognized state concern.

### *Apportionment of the tax.*

National contends that even if the state of Wisconsin can impose a tax on National without violating the due process clause, the present form of the taxing statute is still unconstitutional because it is a gross premium tax which is not fairly apportioned to the activities which National conducts in Wisconsin.

In the area of apportionment of taxes the cases again tend to mix the restrictions of the commerce clause and due process clause. The earlier cases on the subject base their decisions almost exclusively on the commerce clause —that a state cannot tax purely interstate commerce. In *Greyhound Lines v. Mealey* [34] the supreme court held that New York could constitutionally tax gross receipts from a common carrier of passengers if the receipts were apportioned as to the mileage within the state. The court said:

". . . In a case like this nothing is gained, and clarity is lost, by not starting with recognition of the fact that it is interstate commerce which the State is seeking to reach and candidly facing the real question whether what the State is exacting is a constitutionally fair demand by the State for that aspect of the interstate commerce to which the State bears a special relation. . . .

[34] (1948), 334 U. S. 653, 661, 663, 68 Sup. Ct. 1260, 92 L. Ed. 1633.

"... By its very nature an unapportioned gross receipts tax makes interstate transportation bear more than 'a fair share of the cost of the local government whose protection it enjoys.'"

The state of Wisconsin has also required an apportionment of taxation on the sales revenue of a common carrier according to the amount of revenue attributable to its activities in Wisconsin.[35]

In *Northwestern Cement Co. v. Minnesota*[36] the United States Supreme Court held that net income from exclusively interstate operations of a foreign corporation may be subjected to state taxation, provided the levy is not discriminatory and is properly apportioned to local activities within the taxing state forming a sufficient nexus to support the same. There was no issue as to the reasonableness of the apportionment formula. The court said: "Nor will the argument that the exactions contravene the Due Process Clause bear scrutiny. The taxes imposed are levied only on that portion of the taxpayer's net income which arises from its activities within the taxing State."

In *General Motors v. Washington*[37] General Motors challenged a state tax imposed on gross wholesale sales of motor vehicles, parts and accessories delivered in the state. In discussing earlier cases on gross receipts taxes the United States Supreme Court said:

"A careful analysis of the cases in this field teaches that the validity of the tax rests upon whether the State is exacting a constitutionally fair demand for that aspect of interstate commerce to which it bears a special relation. For our purposes the decisive issue turns on the operating incidence of the tax. In other words, the question is whether the State has exerted its power in proper

---

[35] *Moore Motor Freight Lines v. Department of Taxation* (1961), 14 Wis. 2d 377, 111 N. W. 2d 148.

[36] (1959), 358 U. S. 450, 464, 79 Sup. Ct. 357, 3 L. Ed. 2d 421.

[37] (1964), 377 U. S. 436, 440, 441, 84 Sup. Ct. 1564, 12 L. Ed. 2d 430.

proportion to appellant's activities within the State and to appellant's consequent enjoyment of the opportunities and protections which the State has afforded. Where as in the instant case, the taxing State is not the domiciliary State, we look to the taxpayer's business activities within the State, *i.e.*, the local incidents, to determine if the gross receipts from sales therein may be fairly related to those activities."

At another point in the case the court indicated that unapportioned gross receipts taxes are "suspect." However, the supreme court finally concluded that General Motors which had many dealers in Washington and warehouse facilities, etc., had so mingled its taxable business with that which was not taxable that it was permissible to attribute sales to local activities. The court found a "maze of local connections."

And in *General Motors v. District of Columbia* [38] the supreme court was asked to review an administrative regulation implementing an income tax statute which was based on that portion of net income which is " 'fairly attributable to any trade or business carried on or engaged in within the District . . . .' " The court found that a regulation based on a sales factor alone did not implement the statutory objective of apportionment. The court made it clear, however, that if it had to reach the constitutional issue of due process the result would have been the same:

". . . We of course do not mean to take any position on the constitutionality of a state income tax based on the sales factor alone. For the present purpose, it is sufficient to note that the factors alluded to by this Court in justifying apportionment measures constitutionally challenged in the past lend little support to the use of an exclusively sales-oriented approach." [39]

The in-state and out-of-state activities of a mail-order insurer are sufficiently separable to require apportion-

[38] (1965), 380 U. S. 553, 554, 85 Sup. Ct. 1156, 14 L. Ed. 2d 68.
[39] *Id.* at page 561.

ment. With no place of business or agents within the state there would be no "maze of local connections" which justified a gross receipts tax in the *General Motors v. Washington Case*. William Patty in his article in *The Tax Lawyer* [40] had this to say:

". . . The premium tax is in effect a single factor apportionment formula based solely upon receipts. Although the receipts are the result of a chain of activities beginning in the domiciliary state and ending with the capture of the premium in the risk state, the principal activities are at home. There are located the insurer's only office, all of its tangible properties and all of its employees. There is undertaken all of the study and research that leads to the writing of the policies, their form and content. There all the mortality and accident studies of an actuarial nature are made, and in effect the 'manufacture' of the insurance conducted. There the investment of the premiums is made and the reserves are accumulated out of which benefits are paid. The risk state premium tax, therefore, in focusing only upon the receipt of the premium, would seem to ignore by far the bulk of the activity involved."

Those cases which have dealt with gross premium taxes have not validated such taxes on the issue of apportionment. In *Prudential Ins. Co. v. Benjamin* [41] a gross premium tax of three percent for the privilege of doing business within the state was validated against charges that it violated the commerce clause. The case established that the McCarran Act eliminated objection to state regulation and taxation of insurance based on the commerce clause. However, the issues of jurisdiction to tax, or necessity to apportion the tax under the due process clause were not in issue in *Benjamin*. In *Equitable Life Society v. Pennsylvania* [42] the court decided the

[40] *Supra,* footnote 6, at page 380.
[41] *Supra,* footnote 8.
[42] *Supra,* footnote 30.

narrow issue of whether a premium tax could be measured on both premiums received within the state and those sent to foreign insurance companies at their offices outside the state. The court found that this did not amount to taxing property beyond its jurisdiction. And in *Lincoln Life Ins. Co. v. Read* [43] the sole issue was whether the equal protection clause was violated by a higher gross premium tax on foreign insurance companies. The court held that a more onerous tax on a foreign insurer was not a violation of the equal protection clause.

These supreme court cases have established the constitutionality of gross premium taxes (if apportioned) as against the contention that they are an unfair burden on interstate commerce. However, if not apportioned the tax may be, as here, unconstitutional, as a violation of the due process clause.

Sec. 201.42 (11) (a), Stats., is clearly an unapportioned tax. The statute provides for a three percent tax on gross premiums; it does not provide for a tax on that portion of gross premiums attributable to activities within the state. Thus here it is not a question of approving or disapproving a particular apportionment formula. We cannot order an apportionment to save the constitutionality of the statute as it would amount to rewriting the statute.[44] Other Wisconsin tax statutes, most notably the income tax statutes, provide for apportionment of income directly in the statute.

*By the Court.*—Judgment reversed.

---

[43] (1945), 325 U. S. 673, 65 Sup. Ct. 1220, 89 L. Ed. 1861.

[44] In *Greyhound Lines v. Mealey, supra,* footnote 34, the United States Supreme Court was able to remand the case for proper apportionment because it was agreed that as a matter of construction the statute permitted such apportionment.