[S.F. No. 24557. Oct. 31, 1983.]

ILLINOIS COMMERCIAL MEN'S ASSOCIATION,
Plaintiff and Appellant, v.
STATE BOARD OF EQUALIZATION, Defendant and Respondent.

NATIONAL LIBERTY LIFE INSURANCE COMPANY,
Plaintiff and Appellant, v.
STATE BOARD OF EQUALIZATION, Defendant and Respondent.

840

COUNSEL

John R. Maloney, Peter W. Fisher, Mark O. Rorem, Maloney, Chase, Fisher & Hurst, Franklin C. Latcham, Prentiss Willson, Jr., Anne C. Bloomdahl and Morrison & Foerster for Plaintiffs and Appellants.

John K. Van de Kamp and George Deukmejian, Attorneys General, and Timothy G. Laddish, Deputy Attorney General, for Defendant and Respondent.

## Opinion

**MOSK, J.**—We are asked to determine whether California may impose a tax on gross premiums collected by foreign insurers who solicit business in California by mail from outside the state, and who utilize independent contractors in California to perform functions incident to the acceptance of applications and the administration of claims. The significant element in making this determination is whether the contacts between the insurers and the state justify imposition of the tax under the due process clause of the Fourteenth Amendment to the United States Constitution.

Plaintiffs, Illinois Commercial Men's Association (IC) and National Liberty Life Insurance Company (NL) are organized in other states and each has its principal place of business in the state in which it is incorporated. Both companies sold accident, health, and life insurance policies in California by advertising in national publications and by direct mail solicitation of prospective customers. NL advertised in local publications as well. Neither plaintiff owned or leased property in California or employed agents or representatives to solicit business in this state. However, independent contractors acting on their behalf did perform certain acts in California in connection with the administration of claims and other matters. These activities will be described in detail below.

In 1965, the State of California for the first time made the assertion that unlicensed foreign insurers were subject to regulation by the state. NL obtained a certificate and license from the Department of Insurance (department) in August 1968. IC has never sought a license or certificate from the department, and has ceased to solicit business in California.

In May 1968, the department notified plaintiffs of its intention to assert their liability for the payment of a gross premium tax for the years 1963 through 1967, pursuant to article XIII, section 14-4/5 of the California Constitution (now § 28), and Revenue and Taxation Code section 12201. These measures impose an annual tax on insurers "doing business in this state." Prior to this time, the state had not attempted to assess against plaintiffs a tax attributable to premiums received for direct mail insurance sold to California residents. The State Board of Equalization (board) assessed gross premium taxes of $23,504.54 against IC for the years 1963 through 1967, and $47,747.50 against NL for the years 1963 through 1965. Plaintiffs paid the tax and filed claims for refund pursuant to sections 12978 and 12979 of the Revenue and Taxation Code.[1] The claims were denied, and these actions

---

[1] Section 12978 sets forth time limitations on claims for refunds, and section 12979 provides that claims shall be in writing and state the specific grounds upon which they are founded.

against the board seeking refunds followed. The trial court found in the board's favor, holding that the tax was justified in part on the ground that plaintiffs received a benefit from California by virtue of health and police services provided to their insureds. These services promoted the well-being of the insureds, reasoned the trial court, thereby improving "the odds on which the plaintiff insurers are gambling" by their issuance of policies to California residents. Plaintiffs appeal from the ensuing judgment.[2]

■ The United States Supreme Court has considered the circumstances under which a state may, within the limits of the due process clause, impose a tax on a foreign corporation that conducts its business by mail from outside the taxing state. Generally speaking, the taxing state must have a substantial interest in the transactions in order to justify imposition of the tax. This interest is measured by the extent and nature of the contacts between the state and the foreign corporation (such as the presence of agents of the corporation within the state), and the benefits conferred on the corporation by the state. (*Nat. Bellas Hess* v. *Dept. of Revenue* (1967) 386 U.S. 753, 756 [18 L.Ed.2d 505, 508, 87 S.Ct. 1389] (hereafter *National Bellas*).) Plaintiffs vigorously contend that they have insufficient contacts with California and derive no benefits from this state to justify imposition of the tax.

Before discussing in detail the standards which allow a state to tax a foreign corporation and their application to the conduct of plaintiffs' business in California, we consider the board's claim that two cases, one decided by this court and one by the United States Supreme Court, have settled the question at issue. The board asserts that *People* v. *United National Life Insurance Company* (1967) 66 Cal.2d 577 [58 Cal.Rptr. 599, 427 P.2d 199] (hereafter *United National*) determined that mail order insurers may constitutionally be regulated by California, and that *Conn. General Co.* v. *Johnson* (1938) 303 U.S. 77 [82 L.Ed. 673, 58 S.Ct. 436], held a state which has the power to regulate a foreign insurer also has the power to tax it. Thus, the board maintains, it is unnecessary to assess anew the character of plaintiffs' contacts with California to uphold imposition of the tax.

In *United National,* after an exhaustive discussion of the history of state regulation and taxation of foreign insurers under the due process and the commerce clauses, we held unanimously that three mail order insurers (one of them NL), which solicited and negotiated insurance transactions with

---

[2]Although two separate actions are involved, the issues are similar as to both plaintiffs. Unless otherwise noted, the discussion which follows will be applicable to both.

California residents exclusively by mail from offices located outside the state, could constitutionally be regulated by California.[3]

The board insists that this holding applies not only to state regulation of foreign insurers, but also to taxation of such entities. Plaintiffs claim, on the other hand, that contacts between a state and a foreign insurer which would justify regulation or the service of process would not be sufficient to warrant taxation (citing *Jeter* v. *Austin Trailer Equipment Co.* (1953) 122 Cal.App.2d 376, 381 [265 P.2d 130]; *Aldens, Inc.* v. *La Follette* (7th Cir. 1977) 552 F.2d 745, 751, fn. 12), and that a foreign corporation may not be taxed by the state unless the state has conferred some benefits on the corporation and the corporation is present in the state.

The board counters with the United States Supreme Court's opinion in *Conn. General Co.* v. *Johnson, supra,* 303 U.S. 77, which, it claims, holds that the power to regulate and tax are congruent. That decision held invalid a California tax on premiums paid pursuant to reinsurance contracts entered into in Connecticut between a Connecticut insurer licensed to do business in California and other insurers also licensed here. However, since no act in the formation, performance or discharge of the contracts occurred in this state, and the contracts did not depend on any privilege or protection granted by the state, imposition of the tax was held to violate due process. In the course of its opinion, the court declared, "As a matter of convenience and certainty, and to secure a practically just operation of the constitutional prohibition, we look to the state power to control the objects of the tax as marking the boundaries of the power to lay it. Hence it is that a state which controls the property and activities within its boundaries of a foreign corporation admitted to do business there may tax them." (At p. 80 [82 L.Ed. at p. 677].)[4] Plaintiffs challenge the board's interpretation of this language; they assert that the statement means only that a state which may not regulate a foreign corporation does not have the power to tax it.

---

[3]*United National* points out (66 Cal.2d 577 at pp. 583-584) that the McCarran Act (15 U.S.C. §§ 1011-1015), as interpreted in *Prudential Ins. Co.* v. *Benjamin* (1946) 328 U.S. 408, 429-430 [90 L.Ed. 1342, 1359-1360, 66 S.Ct. 1142, 164 A.L.R. 476], excepts state regulation of insurers from the restraints imposed by the commerce clause.

[4]The full paragraph in which the statement appears is as follows: "But the limits of the state's legislative jurisdiction to tax, prescribed by the Fourteenth Amendment, are to be ascertained by reference to the incidence of the tax upon its objects rather than the ultimate thrust of the economic benefits and burdens of transactions within the state. As a matter of convenience and certainty, and to secure a practically just operation of the constitutional prohibition, we look to the state power to control the objects of the tax as marking the boundaries of the power to lay it. Hence it is that a state which controls the property and activities within its boundaries of a foreign corporation admitted to do business there may tax them. But the due process clause denies to the state power to tax or regulate the corporation's property and activities elsewhere." (At pp. 80-81 [82 L.Ed.2d at p. 677].)

■ We confess some doubt as to the meaning of the language quoted, but we cannot accept the correctness of the board's claim that the power to regulate a foreign insurer is always determinative of the power to tax it. The United States Supreme Court has applied substantially the same test to determine the validity under the due process clause of a tax on a foreign corporation both before and after its decision in *Connecticut General.* The relationship between the state and the insurer has been examined to determine whether there is " 'some definite link, some minimum connection, between a state and the person, property or transaction [the state] seeks to tax' " and whether the state has " 'given anything for which it can ask return.' " (*National Bellas,* 386 U.S. 753, at p. 756 [18 L.Ed.2d 505, at pp. 508, 509].)

Although the formulation of the test has varied to some degree, its substance has remained essentially the same in numerous decisions of the high court. (E.g., *Moorman Mfg. Co.* v. *Bair* (1978) 437 U.S. 267, 273 [57 L.Ed.2d 197, 204, 98 S.Ct. 2340] [tax unjustified "unless there is some minimal connection" between the activities of the interstate business and the taxing state]; *Standard Steel Co.* v. *Wash. Revenue Dept.* (1975) 419 U.S. 560, 562 [42 L.Ed.2d 719, 722, 95 S.Ct. 706] [" 'whether the state has given anything for which it can ask return' "]; *Scripto* v. *Carson* (1960) 362 U.S. 207, 211-212 [4 L.Ed.2d 660, 664, 80 S.Ct. 619] ["the test is simply the nature and extent of the activities of the appellant in Florida"]; *Wisconsin* v. *J.C. Penney Co.* (1940) 311 U.S. 435, 444 [85 L.Ed. 267, 270, 61 S.Ct. 246, 130 A.L.R. 1229] [the question is whether the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits afforded by the state].) In the insurance context as well, the high court has considered the extent and nature of the contacts between the taxing state and the foreign insurer to determine whether the tax was justified under the due process clause. (E.g., *State Bd. of Ins.* v. *Todd Shipyards* (1962) 370 U.S. 451 [8 L.Ed.2d 620, 82 S.Ct. 1380] [foreign insurer which carries on no activities, solicits no business, and has no office or agents in taxing state not subject to taxation].)

Plaintiffs rely heavily on *National Bellas, supra,* 386 U.S. 753, in support of their claim that the tax is invalid as to them. *National Bellas* was decided four days after *United National,* and it involved the validity of a tax imposed by Illinois upon a retailer, not licensed to do business in Illinois, and incorporated outside that state. The retailer sold goods to Illinois residents by

means of catalogue solicitations and flyers sent to past and potential customers from outside the state. It did not maintain an office or other place of business in Illinois, had no agents, salesmen, or other representatives there to solicit business or to accept payment for or deliver or service merchandise which it sold, and it owned no property in Illinois. All its contacts with Illinois residents were by mail or common carrier.

The high court, after stating the applicable test as set out above, held that imposition of the tax violated both the due process and the commerce clauses because a state may not impose a tax "upon a seller whose only connection with customers in the State is by common carrier or the United States mail." (386 U.S. at p. 758 [18 L.Ed.2d at p. 509].) It distinguished between mail order sellers who do no more than communicate with customers in the state by such means as a part of a general interstate business, upon whom the tax could not be properly imposed, and sellers with retail outlets, solicitors, or property within the state, which are subject to taxation.

The board claims that *National Bellas* is distinguishable because it held the tax invalid under both the due process and commerce clauses, and because it involved a retailer rather than an insurer. The state has a special interest in insurance matters in view of the nature of insurance and the continuing relationship between the insurer and the state's residents; therefore, claims the board, the standards for state taxation of an insurer are more liberal than those applicable to a retailer. However, the opinion in *National Bellas* considered separately the requirements of the due process and commerce clauses, states that the standards under both provisions are similar, and holds that these provisions were violated by the Illinois tax. Moreover, while it is true that the states have a special interest in the business of insurance, and that interest justifies regulation of an insurer which has lesser contacts with the regulating state than other types of businesses, we do not agree that this enhanced interest also justifies taxation of a foreign insurer under standards less stringent than those applicable to other enterprises. In fact, as we have seen, the United States Supreme Court applies substantially the same standards to insurers as to other businesses in determining whether a state has the right under the due process clause to tax a foreign corporation. (See, e.g., *State Bd. of Ins.* v. *Todd Shipyards, supra,* 370 U.S. 451.)

Thus, we cannot avoid an examination of the relationship between plaintiffs and California to determine whether the tax was justified under the standards set forth above.

The stipulated facts establish the following:

A person interested in purchasing an insurance policy would submit his application by mail to the plaintiffs' home office in another state. If the application was accepted, a contract was formed in the plaintiffs' home state, and a policy was mailed to the applicant.[5] Premiums were paid by mail.

In almost all cases, IC processed applications without investigation, although on an average of five or six times a year, it would request an independent contractor in California to confirm information set forth in an application.

IC sent 648,175 mail solicitations into the state between 1963 and 1965. It issued more than 105,000 policies in California, and approximately 3,318 claims were filed between 1963 and 1967 by California policyholders. When an insured made a claim, IC's practice was to send a form to be completed by the claimant and his physician. Most claims were processed on the basis of these forms, but approximately 10 percent would not be processed until IC received confirming information from independent contractors in California, who collected information from doctors, hospital personnel, or police, and sometimes from the claimant, his family, or his representative.

Ordinarily, IC would pay a claim upon receipt of this additional information, but in certain difficult cases, it would ask another independent contractor in California to obtain confirming data. This contractor had authority to settle claims on behalf of IC. Between 1965 and 1968, 124 California claims were handled in this manner. Two claims resulted in lawsuits in California between 1963 and 1967. IC was represented by California attorneys in the litigation; both suits were ultimately settled.

NL generally processed applications without investigation. It had 885 life insurance policyholders in California between 1963 and 1965, and 38,167 accident and health policyholders. In that period, 7,745 claims were filed by California residents. During the processing of these claims, NL would on occasion request Retail Credit Company in Pennsylvania, an independent organization, to contact its California office to collect necessary data by interviewing doctors, hospital personnel, police, and other persons, and by obtaining copies of documents, such as the reports of doctors and police.

---

[5]NL also conducted solicitations by sending a policy to a prospective customer which could be accepted in California by executing a "validating certificate" and mailing it to the company.

Between 1963 and 1965, it utilized Retail Credit Company to collect information in connection with 2 percent of the claims filed. Retail used 175 representatives to conduct about 153 investigations in California on behalf of NL, which paid approximately $3,785 for these services. This amount represented less than one-third of 1 percent of the premiums collected by NL. Retail was not authorized to offer or make settlements on behalf of NL.

Plaintiffs claim that, like the retailer in *National Bellas,* they have no employees or property in California, and their activities in this state amount substantially to communication with customers by mail. They assert that the application, verification, and claims procedures described above were minimal and sporadic, and were insufficient to justify imposition of the tax. We disagree.

We observe, first, the fact that a foreign corporation performs acts in the taxing state through persons it designates as independent contractors is not determinative of whether the nexus required for taxation is present. In *Scripto* v. *Carson, supra,* 362 U.S. 207, the high court considered the imposition of a tax on a foreign corporation by Florida. The corporation had entered into contracts with 10 salesmen who lived in Florida and who solicited orders for the products manufactured by the corporation. They forwarded these orders to the corporation's home office out of the state. The contracts designated each salesman as an "independent contractor." The corporation had no offices or property within Florida. Nevertheless, this arrangement provided a sufficient nexus to justify the tax. The labelling of the salesmen as "independent" was not controlling, it was held, because it would "open the gates to a stampede of tax avoidance" if such a formal contractual designation were allowed to make a constitutional difference. (362 U.S. at p. 211 [4 L.Ed.2d at p. 664].)

In the present case likewise, the circumstance that investigation and/or settlement services on behalf of plaintiffs in California were performed by independent contractors is of little constitutional significance. The undeniable fact is that they were acting as agents of plaintiffs. Although plaintiffs assert a distinction between the present case and *Scripto* because the salesmen in *Scripto* solicited business for the foreign corporation, whereas here plaintiffs' agents did not perform that function, we are unimpressed by such distinction. What is significant in the present context is that the investigation and settlement of claims is an integral and crucial aspect of the business of insurance. Either or both of these functions were performed with respect to California policyholders by agents of plaintiffs residing in this state.

The utilization by NL of 175 representatives to conduct 153 investigations in California in a 2-year period, and the investigation of 331 claims by IC's agents, who had authority to settle a substantial portion of such claims, cannot be viewed, as plaintiffs urge, as conduct so "sporadic," and "peripheral" to their business that it amounts only to the "slightest presence" by them in California for purposes of taxation. (*National Geographic* v. *Cal. Equalization Bd.* (1977) 430 U.S. 551 at p. 556 [51 L.Ed.2d 631 at p. 637, 97 S.Ct. 1386].)

That plaintiffs' agents, whose offices were in California, received the protection of this state's laws can hardly be doubted. In *Scripto,* the "benefit" aspect of the constitutional test was not discussed, apparently on the assumption that a foreign corporation which has agents in the taxing state also receives the protection of that state's laws. And in *Standard Steel Co.* v. *Wash. Revenue Dept., supra,* 419 U.S. 560, an out-of-state supplier was held to enjoy the protection and benefit of the state's laws because it employed in the taxing state a single employee who worked out of his home, and who "made possible the realization and continuance of valuable contractual relations" between the taxpayer and a Washington corporation. The taxpayer's assertion that its activities in Washington "were so thin and inconsequential" that it derived insufficient benefit to justify the tax "verges on the frivolous," declared the court. (419 U.S. at p. 562 [42 L.Ed.2d at p. 722].) Similarly, in the present case, the agents employed by plaintiffs performed for them a function crucial to the administration of the insurance policies covering California residents. The benefits afforded to these agents also benefitted plaintiffs.[6]

We hold, therefore, that the character and extent of plaintiffs' activities in this state were sufficient to form the "definite link" and "minimum connection" required to justify imposition of the tax, and that plaintiffs received the benefit of this state's laws through the protections afforded to their agents in California.

Our conclusion is supported by decisions from other jurisdictions. In three cases, the power of a state to tax mail order insurers was upheld even though the activities of the insurers in the taxing state were similar to or less ex-

---

[6]The board argues that, as the trial court held, plaintiffs received the benefit of California's health, police and court systems, since these protections and services had the effect of diminishing the claims made against plaintiffs on the policies sold to Californians. Plaintiffs counter that these benefits did not accrue to them because they took such services into account in setting insurance rates. Therefore, they assert, it is the California insureds rather than plaintiffs who gained from the benefits and services provided by the state. We need not resolve this debate in view of the conclusion we reach.

tensive than those of plaintiffs. In *Ministers Life and Casualty Union* v. *Haase* (1966) 30 Wis.2d 339 [141 N.W.2d 287], the insurer employed methods of solicitation similar to those in the present case for insurance contracts with individuals. Unpaid "group leaders" negotiated insurance contracts for some group policies, enrolled members, received the policies and premium notices, and collected and remitted premiums. There was no indication that local agents performed claims investigations. *National Liberty Life Ins. Co.* v. *State* (1974) 62 Wis.2d 347 [215 N.W.2d 26] upheld a tax on a foreign mail order insurer largely on the basis of the substantial volume of business enjoyed by the insurer in the state.

*Armed Forces Co-op etc.* v. *Dept. of Ins.* (Wyo. 1980) 622 P.2d 1318, involved a foreign insurer which was an unincorporated, nonprofit military association, all of whose members were active or retired military personnel. The insurer urged its members in Wyoming to solicit others to buy insurance. It had no paid representatives, salesmen, offices or property in Wyoming and had only 99 policies in force in that state. Most claims were paid without investigation but, if the insured chose, he could seek to have the claim evaluated by a professional claims adjuster or a volunteer advisory board consisting of three unpaid persons, or he could obtain a statement from a local official or disinterested witness concerning the circumstances of the loss.

While the foregoing cases related to the power of the state to both regulate and tax a foreign insurer, we do not deem this circumstance significant. It should also be noted that the United States Supreme Court dismissed appeals for want of a substantial federal question in *Ministers* (385 U.S. 205 [17 L.Ed.2d 301, 87 S.Ct. 407]) and *Armed Forces Co-op* (454 U.S. 1130 [71 L.Ed.2d 284, 102 S.Ct. 985]). Such dismissals constitute a determination on the merits. (*Washington* v. *Yakima Indian Nation* (1979) 439 U.S. 463, 476-477, fn. 20 [58 L.Ed.2d 740, 753, 99 S.Ct. 740]; *Hicks* v. *Miranda* (1975) 422 U.S. 332, 344-345 [45 L.Ed.2d 223, 236, 95 S.Ct. 2281]; *Ohio* ex rel. *Eaton* v. *Price* (1959) 360 U.S. 246, 247 [3 L.Ed.2d 1200, 1202, 79 S.Ct. 978].)

The parties cite numerous other cases in addition to those discussed above in support of their positions, but the facts are so clearly distinguishable from the present circumstances that it would serve no useful purpose to discuss them in detail. (E.g., *Authority to tax foreign corporation denied*: *Norton Co.* v. *Dept. of Revenue* (1951) 340 U.S. 534 [95 L.Ed. 517, 71 S.Ct. 377] [direct orders mailed to and shipped from foreign corporation out of state]; *Miller Bros. Co.* v. *Maryland* (1954) 347 U.S. 340 [98 L.Ed. 744, 74 S.Ct. 535] [purchases made in foreign state; advertising and delivery of goods by

common carrier and occasionally by retailer's own trucks in taxing state]; *St. Louis Cotton Compress Co.* v. *Arkansas* (1922) 260 U.S. 346 [67 L.Ed. 297, 43 S.Ct. 125] [no act by foreign insurer in taxing state but insured property located there]; *Authority to tax foreign corporation affirmed*: *Felt & Tarrant Co.* v. *Gallagher* (1939) 306 U.S. 62 [83 L.Ed. 488, 59 S.Ct. 376] [payment for goods mailed to retailer outside state, but retailer had sales agents in state]; *General Trading Co.* v. *Tax Comm'n.* (1944) 322 U.S. 335 [88 L.Ed. 1309, 64 S.Ct. 1028] [traveling salesmen from state of foreign corporation's domicile traveled to taxing state to solicit sales].)

Our conclusion that the contacts between plaintiffs and California are sufficient to justify imposition of the tax are also important to the resolution of two additional contentions made by plaintiffs.

 First, they argue, they were not "doing business" in California within the meaning of article XIII, section 28, subdivision (b), of the California Constitution which, as we have seen, provides for a tax on insurers "doing business" in this state. They rely on three cases for the proposition that the state in which administrative functions in connection with insurance policies are performed is of "great significance" in evaluating whether a foreign corporation is "doing business" in California. (*Occidental L. Ins. Co.* v. *State Bd. Equal.* (1956) 139 Cal.App.2d 468 [293 P.2d 870]; *People* v. *Alliance Life Ins. Co.* (1944) 65 Cal.App.2d 808 [151 P.2d 868]; *Western T. Acc. Assn.* v. *Johnson* (1936) 14 Cal.App.2d 306 [58 P.2d 206].) Of these cases, only *Alliance* invalidated a tax based on insurance premiums. That case, unlike the present one, did not involve the employment by the insurer of agents within California to perform important functions in connection with the administration of the policies it had issued to this state's residents.[7] These activities are sufficient to justify the conclusion that plaintiffs' were "doing business" in this state within the meaning of the Constitution.

 Next, plaintiffs urge, the tax is invalid as a violation of due process and equal protection because it is measured by the total premiums collected from California policyholders, and therefore reaches "profits which are in no just sense attributable to transactions" within this state. (See *Hans Rees' Sons* v. *No. Carolina* (1931) 283 U.S. 123, 134-135 [75 L.Ed. 879, 905-

---

[7]In *Alliance,* the insurer had ceased soliciting business in California and did not renew its certificate of authority to conduct business in this state, nor did it write any new policies. It did, however, continue to collect renewal premiums from California residents on policies effective before it surrendered its license. These premiums were mailed to Illinois. The state's attempt to tax these renewal premiums was held invalid on the ground that the insurer was no longer "doing business" in California.

908, 51 S.Ct. 385].) Plaintiffs contend the premiums they received from California policyholders were generated largely by activities carried out in their home states, and California's imposition of the tax on the whole of the premiums collected is "out of all appropriate proportion to the business transacted" in California.

A number of cases have held that a tax based on the total sales made within a state is not invalid even though some activities (including major functions such as the manufacture of the product) occurred in other jurisdictions. *Standard Steel Co.* v. *Washington Revenue Department, supra,* 419 U.S. 560, upheld a Washington tax based on the total sales of a manufacturer in the taxing state even though its home office and manufacturing plants were located outside the state. Aside from periodic visits by the taxpayer's engineers to its principal customer in Washington, the corporation's total activity in Washington consisted of the employment of a single employee who worked out of his home and consulted with the customer regarding its needs, and followed up if any difficulties arose after delivery of the product. It was held that the tax was "'apportioned exactly to the activities taxed,'" i.e., the sales which resulted from the activities of the taxpayer's employee in Washington, who "made possible the realization and continuance of valuable contractual relations" between the taxpayer and the corporation. (419 U.S. at pp. 562, 564 [42 L.Ed.2d at pp. 722, 723].) A similar result obtained in *General Motors* v. *Washington* (1964) 377 U.S. 436, 448 [12 L.Ed.2d 430, 439, 84 S.Ct. 1564], in which a tax on the wholesale price of automobiles and parts manufactured outside Washington was upheld on the ground that the taxpayer had mingled its taxable business with that which it claimed to be nontaxable through "a maze of local connections."

In *Moorman Mfg. Co.* v. *Bair, supra,* 437 U.S. 267, an Iowa tax on the gross sales of products manufactured by a foreign corporation in another state was held to be valid even though the court recognized that the profit from the sales was generated in part by the corporation's activities in the foreign state. The opinion comments that the states have a "wide latitude in the selection of apportionment formulas," and an assessment will only be disturbed if "the taxpayer has proved by 'clear and cogent evidence' that the income attributed to the State is in fact 'out of all appropriate proportions to the business transacted . . . in that State,' . . . or has 'led to a grossly distorted result.'" (437 U.S. at p. 274 [58 L.Ed.2d at p. 205].)[8]

---

[8]The tax in *Moorman* was not based on gross sales made in Iowa, but it was unapportioned in the sense that it was measured by the proportion which the sales made within the state bore to the gross sales of the taxpayer. Since the formula did not take into consideration the fact that some of the amounts realized from the Iowa sales may have been attributable to the state in which the goods were manufactured, the tax was "unapportioned" in the respect we discuss here.

Finally, in *Equitable Life Assurance Society* v. *Pennsylvania* (1915) 238 U.S. 143 [59 L.Ed. 1239, 35 S.Ct. 829], Pennsylvania imposed a tax on the gross premiums written on policies which covered residents of that state, even though some of the premiums were paid outside the state by Pennsylvania residents. In upholding Pennsylvania's right to tax such premiums, the court noted that a certain latitude must be allowed in measuring the tax, that many incidents of the contract occurred in Pennsylvania (such as payment of dividends when received in cash, sending an adjuster into the state in case of dispute, or making proof of death), and that it was "not unnatural" to take the policyholders residing in Pennsylvania as a measure of the tax because taxation "has to be determined by general principles." (238 U.S. at p. 147 [59 L.Ed. at p. 1242].)

■ While these cases are distinguishable on their facts, they state principles which are applicable to the tax under consideration here: an unapportioned tax measured by the total sales of a foreign corporation within a state may be valid even though major functions which contributed to the value of the taxed product, such as its manufacture, occur outside the taxing state; the importance of the foreign corporation's activity in the taxing state to the "realization and continuance" of the corporation's business therein is a significant factor in evaluating the contacts between the state and the corporation; and the taxpayer challenging the failure to make an apportionment has the burden of showing by "clear and cogent" evidence that the tax is out of all proportion to the business transacted in the state and leads to "grossly disproportionate results."

■ Plaintiffs have not made such a showing here. Their agents in California conducted on their behalf a substantial number of investigations of claims made by California policyholders. Although the number of these investigations was not overwhelming in comparison with the over-all number of claims filed by this state's residents—most claims could be processed without local investigation—whenever such investigations were required because telephone or mail inquiries were inadequate to resolve plaintiffs' questions regarding the claims, they were conducted by plaintiffs' agents in California. Indeed, IC's agents had the power to conclude settlements on its behalf. Moreover, as we have observed, the investigation of claims is an important and integral part of the business of insurance; the conduct of plaintiffs' agents was critical to the "realization and continuance" of the business conducted by plaintiffs in this state. We conclude, therefore, that plaintiffs did not show by "clear and cogent" evidence that the unapportioned tax on the premiums of California policyholders is out of all propor-

tion to the conduct of their business in this state, so as to lead to "grossly disproportionate results."[9]

■ Plaintiffs' final argument is that the state should be estopped to impose the tax retroactively. They claim that they justifiably relied on the general understanding in the legal community and the insurance industry prior to 1968—when the state first sought to impose the tax in issue—that mail order insurers were not subject to a tax on premiums,[10] and that affirmative representations to that effect were made to them by a California official. They urge that it would be unjust to allow the state to levy a tax upon them retroactively in view of such reliance, particularly because they are unable to recoup the tax from the insureds.

■ *U.S. Fid. & Guar. Co.* v. *State Bd. of Equal.* (1956) 47 Cal.2d 384 [303 P.2d 1034], sets forth the general rules applicable to estoppel of the government in tax matters. Estoppel is available only in the "unusual case" in which its justification is "clear and the injustice great." The failure to collect the tax authorized by a statute is insufficient to justify estoppel, even if the taxpayer relies on an erroneous construction of a statute by an official. (*Id.* at pp. 389-390.) Nevertheless, the opinion proceeds to discuss whether certain conduct of the Insurance Commissioner constituted a "clear representation" that a portion of the insurer's premiums in that case would not be taxed. It concludes that the commissioner's conduct was not such "as would satisfy an estoppel in connection with taxes." (*Id.* at p. 392.) ■ We need not decide whether even a "clear representation" by a public official that a tax is not payable can immunize a taxpayer from the duty to pay a tax authorized by law, because we determine that such representation was not made in the present case.

The "clear representation" relied on by plaintiffs is contained in a letter written in 1961 by an official in the compliance and legal division of the department stating, "[t]he laws of this State do not, and it is our understanding that they could not constitutionally regulate the transaction of insurance through the United States mail."

---

[9]*National Liberty Life Ins. Co.* v. *State, supra,* 215 N.W.2d 26, concluded that a tax on gross premiums of a mail order insurer was invalid because it was unapportioned. The board challenges this conclusion on its merits, but we need not discuss the reasoning of the decision in detail since in that case, unlike the situation here, there was no evidence of claims settlement activity in Wisconsin by the foreign insurer.

[10]Plaintiffs rely, for example, on a report of the National Association of Insurance Commissioners in 1968 that direct mail insurers "have ample reason to suppose" that they are not subject to taxation. (See also Hanson & Obenberger, *Mail Order Insurers* (1966) 50 Marq.L.Rev. 175.)

The letter was written to an individual in NL's home state who acted as a consultant to the president of NL, and there is no indication that IC was aware of its content. ■ IC's reliance argument, therefore, is based largely on the state's omission to collect the tax and assumptions made by a national organization and others that the tax would be invalid if it were imposed. Obviously, these matters are insufficient to constitute justifiable reliance.

■ NL's claim that the 1961 letter provides a basis for such reliance is unconvincing. The letter does not refer to state taxation of mail order insurers, but to their regulation, and NL could not properly have relied on the statements made therein as referring to taxation. The basis of NL's claim to the contrary is its premise that a state which does not have the power to regulate a mail order insurer a fortiori does not have the power to tax it, since a higher level of contacts is required for taxation than for regulation. Thus, it is argued, the statement in the letter referring to regulation also amounted to a representation relating to taxation.

Assuming, without deciding, the validity of NL's premise that a state without power to regulate also cannot tax, there is no indication in the letter that the official who wrote it made the representation upon that assumption. In any event, NL could not have justifiably relied upon any such representation. The letter was written not by an official of the board which is the agency authorized to assess the tax (Rev. & Tax. Code, § 12412), but by an official of the department.[11] NL never sought a ruling or made any inquiry of the board regarding the state's position on taxation of mail order insurers. Moreover, the letter refers only to an "understanding" of state law with respect to regulation, and cannot reasonably be interpreted as a definitive ruling on the question of taxation. Under all the circumstances, we hold that NL failed to establish that it justifiably relied on a statement by a public official that the premiums received from California residents were not subject to taxation.[12] It is hardly necessary to observe that this is not the "unusual case" in which justification for the estoppel is "clear and the injustice great."

---

[11]We recognize, of course, that the Insurance Commissioner performs some duties with regard to the tax, such as forwarding the tax returns of the insurer to the board (Rev. & Tax. Code, § 12411), auditing the return (§ 12421), and proposing deficiency assessments to the board when appropriate (§ 12422).

[12]In *United National, supra,* 66 Cal.2d 577, 596-597, the same letter was held insufficient to constitute a binding administrative construction of a statute which was there interpreted to allow regulation of mail order insurers, and the failure of the state to attempt such regulation under the statute for many years was held insufficient to justify estoppel of the state to initiate regulation.

The authorities cited by plaintiffs in support of their claim of estoppel are not persuasive. For the most part they involved attempts to retroactively impose a tax following amendment of a statute (*Equitable Life Assur. Soc.* v. *Thulemeyer* (1935) 49 Wyo. 63 [52 P.2d 1223, 1234]) or a change in an official administrative ruling (*Garrison* v. *State of California* (1944) 64 Cal.App.2d 820, 828-830 [149 P.2d 711]), a clearly distinguishable situation from the present case.[13]

The judgment is affirmed.

Bird, C. J., Richardson, J., Kaus, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

---

[13]*Pacific Southwest Airlines* v. *State Board of Equalization* (1977) 73 Cal.App.3d 32 [140 Cal.Rptr. 543], is not contrary to our conclusion. That case concerned a ruling by the board which added a qualification for exemption from the sales tax. The ruling was held invalid as an administrative regulation because the board had failed to follow the statutory procedures for adoption of such a regulation, which would have afforded the taxpayer notice thereof. The facts and issues involved in that case are obviously different than those we consider here. Estoppel was not in issue and the board's interpretation of the requirements for an exemption was held to be invalid. We do not read the language of the opinion, as plaintiffs urge, to require that a taxpayer must receive advance notice of the state's "new understanding" of the meaning of a tax statute to justify imposition of a tax.

Plaintiffs also rely on the recent decision of the United States Supreme Court in *Arizona* v. *Norris* (1983) — U.S. — [76 L.Ed.2d 1236, 103 S.Ct. —], which holds that an employer violated title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) by offering female employees lower monthly retirement benefits than male employees who made the same contribution to the retirement fund. The majority adopted Justice Powell's opinion on the issue of retroactivity, which holds that the decision should not be retroactively applied, because of certain policy considerations. This opinion is not convincing authority in the present case. The primary factors justifying nonretroactivity there do not apply here (i.e., a "devastating" financial effect on the State of Arizona and other governmental bodies, and the likelihood that employers reasonably relied on a prior decision of the high court which led them to believe that their conduct was legal). Moreover, the case does not involve estoppel or the failure of the government to impose a tax authorized by law. In the tax context, even changes in formal rulings have been applied retroactively. (See, e.g., *Dixon* v. *United States* (1965) 381 U.S. 68, 73 [14 L.Ed.2d 223, 227, 85 S.Ct. 1301]; *Automobile Club* v. *Commissioner* (1957) 353 U.S. 180, 183-186 [1 L.Ed.2d 746, 749-751, 77 S.Ct. 707]; *Benedict Oil Co.* v. *United States* (10th Cir. 1978) 582 F.2d 544, 549; see also *Diedrich* v. *Commissioner* (1982) 457 U.S. 191, 200, fn. 10 [72 L.Ed.2d 777, 784, 102 S.Ct. 2414].)